O'BRIEN *v.* 1,614 BAGS OF GUANO.

*(District Court, D. Virginia.* June 8, 1882.)

1. SHIPPING—CHARTER-PARTY—CANCELLATION.

A charter-party made November 22d provided for a voyage from Liverpool to Norfolk and back; the vessel to bring over a cargo of guano, "freight free, and all other conditions as per charter-party," the charterers to furnish her at Norfolk with a full cargo of cotton, etc., at 30 shillings per registered ton, which was above the current rate; charter to commence "when the vessel is ready to receive her cargo at the place of lading," and the charterers to have the right of canceling the contract if she failed to arrive at Norfolk by the 16th of February. The vessel, through no fault of her own, failed to arrive until April 4th, which was too late to use the guano that year, and the charterers canceled the contract. *Held,* that the voyage commenced at Liverpool, and the cancellation applied to the part already performed, as well as that remaining; and, as the guano was evidently brought free in consideration of the high return freight expected, the charterers were bound to pay reasonable freight thereon.

2. ADMIRALTY PRACTICE—SET-OFF.

Under a libel on the guano for the freight, the charterers could not claim a set-off for damages caused by the delay, as a set-off is unknown to admiralty except as a credit on the particular transaction which is the subject of the libel.

In Admiralty. Libel by Edward O'Brien against 1,614 bags of guano, for freight thereon. Decree for libelant.

*Sharp & Hughes,* for libelant.

*Walke & Old,* for claimant.

HUGHES, J. This is a libel on 1,614 bags, part of a cargo of 1,000 tons, of guano and 287 tons of cotton ties, brought by the ship John Bryce from Liverpool to Norfolk. It was taken out on this residue of cargo while still on the ship, for the sum of $1,561.83, claimed to be due to the ship for freight on the said cargo. The libel is founded on a charter-party entered into in the city of Norfolk on the 22d of November, 1881, between Lamb & Co., agents of the ship John Bryce, and the Seaboard Cotton Compress Company, of Norfolk, which stipulated for "a voyage from the port of Liverpool, England, to Norfolk, Va., and then direct to Liverpool, England," and which recites that the ship was then lying in the harbor of Liverpool. On the part of the vessel, it provides, among other things, that the ship shall bring 1,000 tons of salt or (and) guano free from Liverpool to Norfolk, to be unloaded at charterers' expense, with charterers' option of 300 tons additional, at 5 shillings per ton. And in adopting, by reference to, the stipulations of a previous charter for another ship of the same owner, (the O'Brien,) it stipulates, in effect, that if the vessel should not arrive at Norfolk by the 16th of February, 1882, and "prepare for entering on this charter," the charterers should have option of canceling the same. No other consequence in the nature of a penalty or forfeiture is provided in the charter for the event of the ship's default in arriving at Norfolk by the 16th of February. There is also a provision that "this charter shall commence when the vessel is ready to receive her cargo at the place of loading, and notice thereof is given" to the charterers or their agent. On the part of the charterers, it is stipulated, among other things, that they will "furnish the said vessel a full and entire cargo of cotton or (and) other lawful

merchandise from Norfolk, and that they will pay thirty shillings per registered ton for freight on the shipment to Liverpool."

It was shown in the evidence that the ship John Bryce had but recently arrived in Liverpool with a cargo when this charter-party was entered into; that, after unloading, she had to be put upon a dry-dock, to repair the copper upon her bottom, which produced delay; that the ship did not set sail from Liverpool until the 18th of January, 1882; that the weather was bad during the voyage, from which cause she was at sea 76 days; and that she did not arrive at Norfolk until the 4th of April, or 57 days after the time fixed in the charter-party for her being in readiness to take on cargo. It was proved that the ordinary time of passage varied from 25 to 50 days, and that in leaving Liverpool, on the 18th of January, she had but 29 days within which to make the voyage to Norfolk. It was not proved or contended that the delay of the ship in reaching Norfolk was owing to fault on her part. It was proved that the ordinary rate of freight from Liverpool to Norfolk was 10 shillings per ton. The ship took on at Liverpool 1,000 tons of guano and 287 tons of cotton ties. The bill of lading for the guano recites that the cargo was to be delivered to the order of the shippers in Liverpool, or their assignees, "they paying freight for the said goods at the rate of freight free, and all other conditions as per charter-party;" and is dated at Liverpool on the 7th of January, 1882.

It appears from the evidence that 30 shillings was the maximum freight paid for cotton from Norfolk to Liverpool, and that to vessels chartered while in Liverpool less rates (29 or 28 shillings) had been obtained last fall and winter; that to vessels chartered in Norfolk freights were always less than when chartered in Liverpool; that during last winter as low as 26 shillings had been paid to such vessels; and that after the 16th of February last, the charterers, respondents in this case, had in no case paid to such vessels as much as 30 shillings for freights from Norfolk to Liverpool.

The ship not having arrived at Norfolk by the 16th of February, 1882, the charterers exercised the privilege which they had reserved, and canceled the charter. They made tender of four shillings a ton as freight on the ties, and since the filing of this libel have deposited in the registry of the court the sum of $279.26 as the net amount admitted to be due on that account, together with the costs of this proceeding which had accrued up to the time of the deposit. The libelant claims at the rate of five shillings per ton for the whole cargo. The respondent claims that, notwithstanding the cancellation of the charter, the libelant is still bound to deliver the guano free of freight. It is conceded that there has been no transfer of the ownership of the cargo since it was shipped, and that it is still the property of the charterers. There is no pretense that there was any fall in the price of guano between the 16th of February and the 4th of April, 1882. It was claimed and proved, however, that the guano arrived too late to be used by the truck farmers in the vicinity of Norfolk on the crops of the present year.

The single question in this case is whether, after canceling the charter

as to the voyage from Norfolk to Liverpool, the charterers can claim that its provision requiring the 1,000 tons of guano from Liverpool to Norfolk to be brought free still binds the ship. It is plain, and will not be contested, that the inducement which led the owner of the ship to bring the guano to Norfolk free was the stipulation of the charterers to pay the high price of 30 shillings per ton for the "full and entire cargo," which the ship was to receive at Norfolk. The charterers, by canceling the charter, deprived the ship of the full cargo and the high freight, for which she came to Norfolk. The inducement which brought the ship here being thus withheld, was she still bound to render, without compensation, the service which she had promised in consideration of the expected cargo and ·freight? If this was her bargain, then she must stand by her bargain. But there is nothing in the charter-party which expressly, or by implication, settles this question one way or the other. What was the effect, then, of the cancellation of the charter-party? It in terms provided for "a voyage from Liverpool to Norfolk, and thence direct to Liverpool;" treating as an entirety the trip both ways. The charter, in terms, provides that it is to "commence when the vessel is ready to receive her cargo at the place of loading, and notice given the charterers," which, in this case, as 1,287 tons of cargo were first received on board the ship at Liverpool, commenced at Liverpool. In this respect this charter differed from that of the ship O'Brien, to which it refers; which latter, in terms, provided only for a voyage "from Norfolk to Liverpool." The cancellation of the O'Brien's charter, if it had been canceled, might probably with reason have been construed as affecting only the voyage from this port. But the present charter treats, in terms, as one voyage, the round trip from Liverpool back to Liverpool. So that, to cancel it in Norfolk, when it was already nearly half executed, would have a different effect from that which a cancellation might have had in the O'Brien case. This charter-party gave the right to the charterers, in case of the ship's default, to cancel at Norfolk "the charter." It did not give the right to cancel a part of the charter and retain the rest. It did not impose any forfeiture, or penalty, or duty, or service on the ship, for default in arriving at Norfolk by the 16th of February, except alone that it authorized the charterers to cancel the instrument in its entirety. If the parties had intended a further forfeiture or consequence, they ought to have expressed it in the instrument. When parties to an instrument take pains to insert one provision as a result of a default, that fact excludes all implications as to other provisions. The maxim, *expressio unius est exclusio alterius*, is the leading maxim in the construction of all writings, whether contracts, deeds, or statutes. The cancellation of the charter-party was therefore an abrogation of every stipulation it contained, whether in favor of one party to it or the other. The charterers were no longer bound to furnish a cargo, or to pay 30 shillings per ton of freight to the ship; and the ship was no longer bound, *quoad* the charterers, to transport the guano free. The cancellation of the charter gave to the ship the right to claim freight upon the guano on the basis of *quantum meruit*.

Mention was made at bar of the expression employed in the bill of lading, holding out that the guano was shipped "freight free, and all other conditions as per charter-party." If there had been an assignment of the guano by the consignees, and, on its arrival in port, these other *bona fide* owners had claimed it of the ship "freight free," a strong equity might might have been presented in behalf of these third persons. But even they were put on their guard by the express reference to the charter in the bill of lading; and even they could not have claimed, in contravention of the charter, release from the freight against the ship herself, however conclusive their claim may have been against the consignees, from whom they had received an assignment of the bill of lading. As against even *bona fide* assignees of the bill of lading, the ship could hold the cargo for the freight, if entitled to hold it against the charterers; for it was but the other day decided by the United States supreme court, in *Pollard* v. *Vinton*, 105 U. S. 7, that a bill of lading differs essentially from a bill of exchange or promissory note in the hands of a third party. The court said that, notwithstanding a bill of lading "is designed to pass from hand to hand with or without indorsement, and is efficacious for its ordinary purposes in the hands of the holder, it is not a negotiable instrument or obligation in the sense that a bill of exchange or a promissory note is. Its transfer does not preclude, as in those cases, all inquiry into the transaction in which it originated, because it has come into the hands of persons who have innocently paid value for it. The doctrine of *bona fide* purchasers only applies to it in a limited sense. It is an instrument of a twofold character, at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property on board his vessel by the owner of the vessel; in the latter, it is a contract to safely carry and deliver." See, also, *Fechtenburg* v. *The Woodland*, 104 U. S. 180. Therefore, even if there had been no reference on the face of the bill of lading, in this instance, to the charter-party, the transfer of the bill and of the property in the cargo to a third party by the charterers would not have defeated the rights of the ship in the cargo. It could libel the cargo *in rem* for the freight as long as it held custody of it; and only in case it had delivered the cargo to the assignee of the bill of lading, would it have lost the right to libel *in rem*. Even after such delivery it would have had the right to proceed in admiralty by libel *in personam* against the charterers in their character as the charterers in this charter-party.

On the whole case, I think that the libelant is entitled to recover a fair freight for the guano. The evidence shows that that would have been ten shillings per ton. In a spirit of compromise, he claims only five shillings, and that amount will be decreed. Under the charter, the charterers stipulated that the unloading in Norfolk should be at their own expense. Their claim in their answer of the right to deduct this expense is negatived by their own stipulation. Aside from this agreement, however, I think a freight of five shillings per ton, net, should be allowed the libelant, and I will so decree.

I hardly need to add that, if the charterers have experienced any loss

from the late arrival of the guano which was brought by this ship, their damages cannot be the subject of a set-off in this proceeding, but must be sued for in another proceeding, if sued for at all. Set-off is a statutory right, unknown to admiralty, except as a credit on the particular transaction which is the subject of the libel.