**AMERICAN FOREIGN S. S. CORP. v.
9,000 TONS OF MANGANESE
ORE et al.**

Civ. No. C–10102.

United States District Court
D. New Jersey.

July 15, 1952.

Carpenter, Gilmour & Dwyer, Jersey City, N. J., Pyne, Lynch & Smith, New York City, for libelant.

Toner, Speakman & Crowley, Newark, N. J., Rawle & Henderson, Philadelphia, Pa., for respondents and cross-libelant.

FORMAN, Chief Judge.

This is a suit in admiralty brought by the American Foreign Steamship Corporation, as chartered owner of the steamships Oscar Chappell and Walker D. Hines, to enforce a maritime lien for freight in the amount of $162,000 against a cargo of approximately 9,000 tons of manganese ore carried by these vessels in the period from February to April of 1947. The cargo was attached at Hoboken, New Jersey, under process of this court, and was released on stipulation for value filed by the claimant of the cargo, Union Carbide and Carbon Corporation. The suit is in rem against the cargo, and also names as respondents, Union Carbide as owner of the cargo, Lavino Shipping Company as agent of the charterer of the vessels, and E. J. Lavino & Company, the consignee in a bill of lading issued February 18, 1947. The Union Carbide filed a cross-libel against libelant claiming damages occasioned by the attachment of the cargo, and alleging that the demand for freight, in the amount of $162,-000, was arbitrary, excessive and illegal. On June 7, 1948, subsequent to the filing of this libel, a consent decree on stipulation was entered and the sum of $53,215.66 was paid on account of freight due. At the trial it was agreed that proof of amounts claimed be reserved pending the determination on the merits of the issues here involved.

There is little dispute as to the actual facts, most of which were either stipulated or established by undisputed testimony at the trial.

On December 16, 1946 the libelant, American Foreign Steamship Corporation, entered into a voyage charter of the steamship Oscar Chappell, with G. T. Symons & Co., Ltd., London, as agents for the African Manganese Company, Ltd., who was the charterer. Under the terms of the charter the vessel would carry a cargo of 8100 to 9900 tons of ore from Takoradi, Africa, to a port north of Cape Hatteras or Mobile, Alabama, for an agreed freight of $9 per ton delivered weight, less any advances, which although payable upon delivery of the cargo, was considered "earned on shipment". The charter also provided that the cargo should be loaded at the expense of the charterer and discharged at the expense of the vessel, for the payment of commissions aggregating 6¼% and for the payment of dispatch monies for the time saved in loading and discharging. In addition, the charter contained in clause (v) a liberties clause which reads as follows:

"In any situation whatsoever and wheresoever occurring * * * which in the judgment of the carrier or master is likely to give rise to risk of * * detention, damages, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to commence or proceed on or to continue the voyage * * * the ship may proceed · * * * to or stop at any such port or place whatsoever as the master of the carrier may consider safe or advisable under the circumstances, and discharge the goods, or any part thereof, at any such port or place; * * * or the carrier or the master may discharge and forward the goods by any means at the risk and expense of the goods. The carrier or the master is not required to give notice of discharge of the goods or the forwarding thereof as herein provided. When the goods are discharged from the ship, as herein provided, they shall be at their own risk and expense; such discharge shall constitute complete delivery and performance under this contract and the carrier shall be free from any further responsibility. For any services rendered to the goods as herein provided the carrier shall be entitled to a reasonable extra compensation."

On February 19, 1947 the Chappell, having reported to Takoradi in accordance with said charter, completed loading approximately 9,000 tons of manganese ore and sailed on that day bound for Mobile, Alabama. Prior to sailing the master of the Chappell issued a bill of lading for the cargo in accordance with the charter.

On February 20, 1947 the Chappell while proceeding at sea, struck a submerged rock 18 to 20 miles east of Cape Palmas and as a result sustained severe bottom damage and took water in her double bottom tanks. The vessel then put in to Freetown, Africa, for survey where she arrived on February 22, 1947. A survey was held by two surveyors appointed by Lloyds Agents, Freetown, and on the basis of divers' examination they made the following findings and recommendations:

"*Findings—*

"Forepeak, Nos 1 & 2 Port, No 3 Port and starboard, Void tank Port, Nos 4 & 5 Port, and no 6 tanks were all flooded. Remaining tanks No 2 Starboard, Void tank Starboard, Nos 4 & 5 Starboard were dry.

"Bilges were practically dry and soundings show no increase in water in any part except No 1 Starboard which showed an increase of 4 inches in three days.

"After Peak tank is full of fresh water and not damaged. Several indents and holes in Forepeak and No 1 Tank. From after part No 1 tank to engine room tank, strake next to keel, plate was split and set up approximately Nine inches. From engine room tank to No 6 several small holes and indents. · Abaft No 6 all clear. This was all on port side. Centre line division was damaged in No 3 tank flooding starboard side.

"*Recommendations—* .

"Owing to the lack of facilities to discharge part cargo of 9000 tons Manganese Ore, or to effect repairs in Freetown, it is recommended that temporary Certificate of Seaworthiness be issued for vessel to proceed to Dakar for further examination and drydocking if necessary."

On February 24, 1947 the Chappell proceeded to Dakar, Africa, where a drydock was located and where ultimate decision regarding necessary repairs and possible lightening of the ship by removal of some cargo could be made. It arrived at Dakar on February 26th.

The drydock at Dakar was then unavailable and would not be available until March 22d or the 25th. It was further understood that the ship would not be accepted into the drydock until it unloaded at least 4,000 tons of its cargo. Faced with the necessity of making a determination regarding the disposition of the cargo and repairs required to be made to the vessel extensive correspondence primarily in the form of cables were exchanged between the libelant, its agents, agents representing the ship, the cargo, the hull underwriters and the general average adjusters.[1] These parties were further confronted with insurance complications primarily arising out of the general average agreement. Efforts were made to discharge the cargo ashore but the storage facilities then available at Dakar were extremely limited and negotiations to store the cargo, pending completion of repairs, at a coaling company the then only considered available place, were unsuccessful.

There was at this time in the port of Dakar, as a matter of circumstance, another vessel operated by the libelant, the Walker D. Hines. This vessel was also

[1]. Elder Dempster Line, Ltd. (Lloyds agents) were agents for libelant and the Chappell at Freetown, Africa, and had been appointed by Salvage Association and Frank B. Hall to investigate and report on the damage and repairs to the Chappell at Dakar; Societe Quest Africaine D'Enterprises Maritimes were agents for the libelant and the Chappell at Daker; Frank B. Hall and Co., Inc. of New York, who are average adjusters and insurance brokers, were the duly appointed and acting general average adjusters in connection with this disaster. They were also brokers for the hull insurance, seventy five percent of which was written by the American Hull Syndicate and twenty five percent by English hull underwriters, and represented all of the hull interests; Sedgwick, Collins & Co., Ltd. and Bennett & Co. were London representatives of Hall & Co.; Lloyds Underwriters and other marine insurance companies were insurers of the Chappell cargo and were represented in London by Salvage Association who also represented the English hull underwriters.

under charter to respondents, dated November 15, 1946 and similar in terms to the Chappell charter, but had been involved in a like accident as occurred to the Chappell and had been required to drydock at Dakar for repairs. Due to the damage sustained, the Hines had been unable to report between December 15th and 31st, 1946 to Takoradi to pick up her cargo as required by her charter. The Hines was subsequently repaired at Dakar and was ready to sail on March 15, 1947.

Various proposals as to possible transshipment or partial transshipment of the Chappell cargo to the Hines and abandonment of the Chappell voyage were under contemplation by the libelant and its agents but due to general average complications no definitive abandonment of the Chappell voyage was effected.

After a considerable exchange of cables between agents of the various interests involved, a special meeting in London attended by representatives of the cargo underwriters and American and English hull underwriters, was held on March 21, 1947, at which there was proposed a special average agreement as a means of alleviating the problems arising as a result of the accident to the Chappell. With a slight modification, the final agreement thereon was reached on March 25, 1947. The terms and conditions of this special average agreement are embodied in three letters exchanged between Bennett & Co. and Salvage Association, two dated March 21, 1947 and one dated March 25, 1947, and may be summarized as follows:

"1. That the entire cargo of the Oscar Chappell be transshipped to the Walker D. Hines at Dakar and be carried to destination in that vessel without payment of any additional freight.

"2. That the Oscar Chappell after effecting temporary repairs at Dakar be substituted for the Walker D. Hines and proceed to Takoradi and there load the cargo originally allocated to the latter vessel.

"3. That all extra expenses of the Oscar Chappell proceeding from Dakar to Takoradi shall be allowed to General Average.

"4. That the usual General Average expenses comprising wages and maintenance of crew, fuel, stores, etc. to be incurred by the Oscar Chappell while undergoing temporary repairs at Dakar shall be allowed in General Average.

"5. That an allowance of U.S. $1200 per day shall be made in General Average in respect of the Walker D. Hines from the 15th March 1947 when she was ready to leave Dakar for her original normal engagement until she has been completely loaded ready to leave Dakar with the cargo of the Oscar Chappell.

"6. That the transshipping of the cargo shall not be deemed to be a separation of the common interests.

"Provided the whole of the substituted expenses, which are to include the $1200 per day shown in the paragraph marked No. 5, shall be allowed only up to the amount of the General Average expenses saved by the cargo not being discharged, stored and reloaded into the Oscar Chappell."

On March 25, 1947, pursuant to this special agreement, the cargo on the Chappell was taken from that vessel and loaded directly on the Hines, which work was completed on April 4, 1947. The trimming of the Hines was completed on April 5th, and on April 7th the Hines sailed with its cargo for Weehawken, New Jersey, arriving at that port on April 23, 1947.

In the interim the Chappell went into drydock. On April 9th, Lloyd's surveyor after inspecting her hull, rudder, propeller, etc. prepared specifications for temporary repairs. The bid of the French Navy Arsenal Works to carry out these repairs was accepted and the work thereon was to begin on the 12th. An examination of the vessel in drydock by the surveyor indicated that the damage to the bottom was much more serious than had been indicated by the preliminary examination of the divers, and on April 11th the surveyor recommended, in view of the extensive damage to the floors and the apparent unavailability of flooring or framing at Dakar, that the Chappell return light although he would be agreeable to a maximum load of

six thousand tons. It was indicated that the French Navy had estimated that it would take four to five months to strengthen the vessel for a full load but that it would not permit the drydock to be immobilized for such a long period as it was the only drydock on the West African coast.

The temporary repairs that were made consisted of merely making the hull watertight by forming patching plates to conform to the damaged places. Subsequently on April 15th the surveyor advised that he was unsatisfied with the thickness of the patching plates used in the repairing and would not allow the vessel to load any cargo but would only permit it to proceed in ballast. It was also the opinion of the French Navy that the repairs were not sufficient to permit the carrying of cargo. All the repairs that could be made were completed on April 18th and the Chappell was required to leave the drydock on the 23rd. When this information was reported to London, Bennett & Co., representing the general average adjusters, took the position that the special average agreement was inapplicable and that the vessel owners were properly entitled to a new freight before delivery of the cargo on the Hines at destination. This view was communicated to Salvage Association in the form of a memorandum for transmittal to the leading underwriters on both the ship and the cargo on April 16th. The London Hull and Cargo Underwriters were asked to authorize the Salvage Association to send a competent surveyor from London to Dakar by airplane to determine whether the Chappell could be promptly made fit to carry a full homeward cargo to the United States since the owners wanted to know before the arrival of the Hines whether to collect an additional freight on delivery of the cargo. A special surveyor, Casebourne, flown from London made an examination of the Chappell on April 24th, out of drydock, and confirmed the prior findings as to the damage to the bottom. He indicated that the ship was unfit to carry a full cargo and that the amount of cargo which could safely be loaded was trivial and not considered worthwhile for proceeding to Takoradi. He further informed Salvage that to make the vessel fit to carry a reasonable amount of cargo would entail substantial temporary repairs and stiffening in the tanks, a repair which was impracticable to be made at Dakar. Ultimately, the Chappell returned light to Baltimore, Maryland and was repaired at a cost in excess of $170,000.

On April 21, 1947, before the arrival of the Hines, the libelant wrote to the respondent Union Carbide and Carbon Corporation as follows:

"The S.S. Walker D. Hines is expected to arrive at New York on Wednesday, April 23, with a cargo of manganese ore consigned to you, which was originally loaded on the S.S. Oscar Chappell at Takoradi. The voyage of the Chappell was abandoned at Dakar by reason of the vessel's striking a submerged object on February 19, 1947, and thereafter, the cargo was shipped in the Hines.

"Under the circumstances, we must notify you that before the cargo on the Hines can be delivered to you, freight earned by the Chappell in the sum of $81,000 and new freight earned by the Hines in the sum of $81,000, a total of $162,000, must be paid to us in full.

"A copy of this letter is being sent to E. J. Lavino & Company, and to Lavino Shipping Company, both of Philadelphia, Pa."

On April 23 the Hines arrived at Weehawken, New Jersey and prepared to deliver her cargo. A proposal was made by the attorneys for the libelant that the respondents Union Carbide and E. J. Lavino & Co. unconditionally guarantee that they would be responsible for any sums recovered by the libelant over and above the estimated freight due in order to avoid the attachment of the cargo. This proposal was not accepted and the suit and attachment of the cargo followed. The actual freight discharged from the Hines is admitted by all parties to be 8,734.25 tons. In the calculation of the sum paid under the stipulated judgment, deductions were taken for advances at the loading port, commission, dispatch and discharging.

The basic issue in this case involves the construction of the special average agreement and whether under all the circumstances of the case it constitutes a defense to libelant's claim for an additional freight for the carriage of the cargo in the Hines. In its libel (paragraph 10), as amended at the conclusion of the trial, the libelant claimed that it was entitled to an additional freight on the ground that the voyage of the Chappell was "terminated at Dakar" and that the libelant and the Master, for the account of the owner, shipper, consignees or other interested parties, discharged the cargo and it was loaded and shipped on board the Hines for carriage to New York "pursuant to the terms of a Bill of Lading then issued, which Bill of Lading provided that freight would be the same as per charter party, dated December 6." During the course of the trial the libelant made further contention that, assuming that there was no express written charter on the Hines carriage, it would still be entitled to a reasonable rate.

The respondents deny that the voyage of the Chappell was terminated or abandoned and allege that libelant undertook to perform the charter of December 6, 1946 by transshipping the cargo on the Hines. They deny that any Bill of Lading was ever issued covering the carriage by the Hines and that there ever was any agreement between the parties to pay $81,000 or any other sum for the carriage by the Hines. On the contrary, they allege that the libelant specifically agreed to carry the Chappell's cargo on the Hines without additional freight, as provided in the special average agreement.

In support of its contention, as alleged in paragraph 10 of the libel, that the cargo was shipped on the Hines pursuant to the terms of a Bill of Lading then issued, and which is evidence of a contract of compensation for the said carriage, the libelant offered in evidence at the trial a copy of a Bill of Lading (Ex.L–35) received from the vessel's Dakar agent, and a copy of an original Bill of Lading (Ex.L–34) (allegedly one of four) obtained by libelant's port captain from the ship upon her arrival in New York, both of which were signed by the master of the Hines who died before the trial. These Bills of Lading stated, "Freight the same to be paid as per charter party dated December 6", i. e., the Chappell charter rate of $9 per ton, less deductions from Takoradi. Mr. Hunter of Lavino testifying for respondents denied ever receiving any original bill or Bills of Lading and it is to be noted that the Captain's copy was used to obtain the carrier's certificate upon which the entry of the cargo through customs was obtained. I find that it is immaterial to the basic issue in this case to determine whether the respondents or any of their agents received an original Bill of Lading for the carriage by the Hines although it might be noted that the libelant failed to offer any proof on this matter other than what would have been the ordinary course of business. The fact is that there is no evidence in this case of any express contract, either written or oral, whereby any of the respondents agreed to pay an additional freight for the carriage of the cargo by the Hines, and this Bill of Lading is not evidence of any express agreement to the contrary. Northern Pacific Railway Co. v. American Trading Co., 195 U.S. 439, 463, 25 S.Ct. 84, 49 L.Ed. 269. The only express contract on the subject of an additional freight was contained in the special average agreement, and the reference in this Bill of Lading to the December 6th charter is merely in conformity with that part of the special average agreement which provided that the Chappell cargo be transshipped to the Hines without additional freight and which therefore would have entitled the Hines to the same original freight as the Chappell. If the libelant is to recover an additional freight for the transshipment of the cargo on the Hines it can only be upon a quantum meruit basis.

It is clear and the respondents virtually concede that, under the liberties clause (v) of the charter, the libelant, in view of the circumstances shown in this case, would have had the right to terminate the voyage of the Chappell and discharge or forward the cargo by any means at the risk and expense of the cargo. See The Wildwood, 9 Cir., 133 F.2d 765, 767. It is true that there apparently was no available place at

Dakar to discharge the cargo and that such a termination of the voyage would have created some general average problems but this does not derogate from the right that was available to libelant to abandon the voyage. Although there had been no outright cancellation of the Hines charter dated November 15, 1946 between the same parties it is extremely doubtful whether in view of the delay necessitated by the repairs at Dakar, the existence of this charter would have precluded the libelant from transshipping the Chappell cargo on the Hines at the risk and expense of the cargo, and undoubtedly the respondents would not have insisted on performance of the Hines charter at the risk of the Chappell cargo. Actually this alternative was under consideration, as is evidenced from a cable sent by Frank B. Hall & Co. to Bennett & Co. on March 19th and which stated in part:

> "American Foreign therefore intended abandon voyage Chappell tranship Hines charge additional freight". (Stip. Ex. 5)

although the cable further indicated that there was a conflict in views as to the applicability of the York Antwerp Rules (general average) to this situation.

Had the libelant terminated the voyage in this manner it would have been entitled to a full freight for the Chappell carriage under clause 2 of the charter:

> "Although payable on delivery of the cargo freight is to be considered earned on shipment."

The validity of this type of clause has been sustained in a number of cases. Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U.S. 377 and related cases at pages 387, 392, 39 S.Ct. 147, 63 L.Ed. 312; Mente & Co. v. Isthmian S.S. Co., 2 Cir., 122 F.2d 266. The Court of Appeals for the Ninth Circuit in Mitsubishi Shoji Kaisha v. Societe Purfina Maritime, 133 F.2d 552, 558, has commented upon it as follows:

> "For over a quarter of a century the majority, if not all, of the larger steamship companies have had similar clauses in the hundreds of thousands of bills of lading issued for the ocean carriage of merchandise. They are accepted as normal incidents of sea borne commerce and are one of the factors in determining ocean freights. The practice of insuring against all the marine hazards of ship and cargo is universal. The carrier has a lessened insurance factor in his costs of transportation where he is certain of his freight earnings despite a frustration of the voyage. The shipper takes insurance against safe delivery and his policy includes the freight eo nomine or in a corresponding increase in the arrived value of his goods. In charters it is presumably a factor in bargaining between owner and charterer. The charterer may claim a lesser freight charge because the cost of insurance of the freight is borne by him and not by the owner."

However, despite testimony by officers of the libelant to the contrary, I find that the libelant did not exercise its right at that time to terminate the voyage but instead, in view of circumstances heretofore noted, entered into a special average agreement. It was not until April 21, 1947 when the libelant demanded $162,000 from the Union Carbon and Carbide Corporation that it implied an abandonment of the Chappell voyage.

We are then confronted with construing the application of an agreement to circumstances not expressly provided for therein. This agreement was not a formal contract but, as indicated, the terms and conditions were set forth in three letters exchanged in London between Bennett & Company representing the libelant and the American hull underwriters, and Salvage Association, London, who represented the cargo underwriters and British hull underwriters. The libelant construes the agreement as providing that the Chappell cargo would be transshipped on the Hines in consideration of the Chappell earning an additional freight by transporting the cargo intended for the Hines plus certain allowances for loss of time involved in the transshipment, etc. in the Chappell's general average adjustment; that this contract assumed that the Chap-

pell could be repaired and could carry the Hines' cargo; that there was nothing in the agreement to show that the libelant had waived its right to an earned freight by taking over the risk and expense of transshipment to the Hines without consideration of an additional freight; that the special agreement became inoperative and was dissolved when it became impossible to repair the Chappell to enable her to carry the Hines cargo, and therefore this agreement is not a defense to libelant's claim for freight for the carriage by the Hines. In effect, libelant seeks to invoke as applicable to this situation the general principle of frustration of commercial adventures. Where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it." Texas Co. v. Hogarth Shipping Co., 256 U.S. 619, 629, 630, 41 S.Ct. 612, 614, 65 L.Ed. 1123.

The respondents, on the other hand, contend that the voyage of the Chappell under the charter of December 6, 1946 was never abandoned and that it was agreed in the special average agreement that the entire cargo of the Chappell be transshipped to the Hines "and be carried to destination in that vessel without payment of any additional freight;" that the libelant anticipated deriving specific advantages from this agreement in that certain expenses and allowances would be permitted in the general average which would not have been available had the voyage been abandoned and the transshipment been deemed to be a separation of the common interests; that while this agreement further provided that the Chappell, after effecting temporary repairs, would be substituted for the Hines and proceed to Takoradi and there load the cargo origi-

nally allocated to the latter vessel yet there was no limitation or condition in the agreement that it would be effective only in the event that the Chappell could be repaired. Thus, they assert that this is not a situation where the contract was made on the basis of existing facts or conditions which thereafter changed so as to make performance impossible but that any alleged beliefs, expectations, presumptions and understandings on the part of officers of the libelant concerning the ability to repair the Chappell show merely that they assumed a calculated risk when the special average agreement was approved and that they sought to repudiate it only after being disappointed with their own judgment.

■ It is well recognized that a court of admiralty, although it would have no power to set aside a contract voluntarily entered into, because of hardship resulting from its enforcement, may otherwise apply equitable principles to the solution of matters of maritime jurisprudence. See Eagle Star & British Dominions v. Tadlock, D.C., 14 F.Supp. 933. This is a case which calls for the application of such principles for I find that the special average agreement is ambiguous and is not, on its face, determinative of the issues herein. Thus, since the parties never agreed about the legal consequences that should flow from the inability to perform fully the terms of the special agreement the resolution of this matter devolves upon the court which, by inferences drawn from the nature of the contract and the surrounding circumstances must determine whether a condition not expressed was a foundation on which the parties contracted. Cf. The Claveresk, 2 Cir., 264 F. 276, 283.

■ An analysis of the facts of this case indicates that it is not encompassed within the usual run of cases in which a contract is dissolved by "impossibility of performance" or "frustration of purpose" arising from some supervening cause, and little would be gained by an extended discussion of the leading cases under these subject-heads for they provide a minimum of guidance in the peculiar circumstances of the instant matter. While there were several unexpected occurrences at the

Dakar drydock yet the fact that the Chappell could not be adequately repaired to carry a full cargo (a circumstance which obviously did frustrate the purpose of the special average agreement) was primarily attributable to its physical condition already existent at the time the agreement was made. Nevertheless, we do not have a situation, as respondents vigorously argue, where a party seeks exculpation from compliance with a contract on the grounds of the ordinary unilateral mistake of fact. This suit is not analogous, for example, where a party institutes suit for breach of a contract of affreightment and the other party attempts to interpose as a defense thereto "impossibility of performance" arising from its lack of knowledge of a preexisting condition. There is little doubt that the defending party would normally be bound by the terms of its contract and would be held liable for the damage occasioned by its inability to perform. Thus, if A unconditionally agrees to transport goods of B on A's ship, not knowing that it was damaged so that the contract could not be performed, and B could have otherwise contracted for transporting the goods, it would appear that as between A and B, A should bear the responsibility for any damage occasioned by the failure of performance. In the instant case, we are confronted with a different situation. The respondents seek to retain without payment or other consideration the benefits of a partial performance of a contract when there has been a failure of a substantial part of the consideration therefor, embodied in the unfulfilled part of the contract, upon the ground that the libelant had failed to condition expressly the undertaking to carry one cargo without additional freight upon performance of the carriage of the second cargo. In effect, the respondents contend that there has been no failure of consideration because risk of performance (that the Chappell would be able to earn a freight) rather than actual performance was the consideration for the Hines carriage of the original Chappell cargo without additional freight. Whether a promise is made in consideration of actual performance or whether a risk of performance is assumed

by the other party is a question of fact, with the presumption in a doubtful case said to be in favor of the former interpretation. 3 Williston on Contracts, p. 2351.

The special average agreement was not an ordinary contractual commitment made between two parties arising from the usual processes of bargaining. The agreement was made in London, thousands of miles from the scene of the accident to the Chappell, on the basis of the then available knowledge of the Chappell's condition which was equally known to all parties. Even the representatives of those parties who proposed this agreement were apparently not the usual arms-length bargaining agents since Bennett & Co., in addition to representing the hull interests, represented the general average adjusters and Salvage Association while representing the cargo underwriters also represented the English hull underwriters. Furthermore, this agreement was an attempt to alleviate the hardship that would be imposed on the respondents if the libelant had no alternative but to abandon the original Chappell charter. The respondents were already liable for one freight on this cargo and would be compelled to pay a second freight were the Chappell voyage to be terminated. The libelant, on the other hand, was in a position to earn two freights, whether the Chappell cargo be transferred to the Hines or the Hines go to Takoradi for a cargo. The effect of the special average agreement had it been fulfilled would have been to eliminate the payment of a third freight by respondents in exchange for allowing in the general average of the Chappell certain additional expenses. Under these circumstances and even under the language of the agreement I am not persuaded that, the respondents were entitled to have the Chappell cargo shipped on the Hines without additional freight when it was not possible for the Chappell to be substituted for the Hines and earn a freight for the latter cargo. The letter of March 21st which comprises part of the agreement contains this language:

"Tranship Chappell cargo to Hines and substitute Chappell after tempo-

rary repairs to Hines cargo from Takoradi * * * but without additional freight."

This language reinforces my view that the substitution of the Chappell for the Hines after temporary repairs and the earning by the Chappell of a freight for the carriage of cargo originally to be shipped on the Hines was one of the foundations of the contract and under all the circumstances of this case an implied condition for its existence. Cf. Taylor v. Caldwell, 3 B. & S. 826 (1863); The Tornado, 108 U.S. 342, 351, 2 S.Ct. 746, 27 L.Ed. 747. See, also, Rest. of Contracts, § 460.

The factual situation here repudiates the concept that the libelant forfeited its right to an additional freight which it could have earned either by transshipping the Chappell cargo to the Hines or by permitting the Hines to continue to Takoradi for a cargo and that it assumed the risk of the Chappell being repaired for the advantage of gaining certain added expenses in the general average. As far as I can ascertain the respondents are in no worse position by the dissolution of the special average agreement than they would have been originally had the Chappell voyage been abandoned immediately following the accident to it.

The only case brought to our attention which might be construed as somewhat analagous to the instant matter is O'Brien v. 1614 bags of Guano, D.C.Va.1882, 48 F. 726, 727. This was a libel to enforce a lien for freight on a cargo of guano shipped from Liverpool, England to Norfolk, Virginia, although the bill of lading recited that the shippers or their assignees were to pay freight for the said goods "at the rate of freight free, and all other conditions as per charter-party". The charter had provided, in part, that the guano was to be shipped freight free and that the charterers would, in turn, furnish a full and entire cargo of cotton or other merchandise for the return voyage from Norfolk to Liverpool at a specified freight rate. The charter further provided that if the vessel should not arrive at Norfolk by February 16th the charterer would have the option of canceling the same. It was shown that the vessel had only recently arrived in Liverpool with a cargo when the parties entered into the charter; that, after unloading she had to be put into drydock for repairs, which produced delay; that due to bad weather the voyage took 76 days whereas the ordinary time of passage varied from 25 to 50 days; and that the vessel did not reach Norfolk until April 4th although there was no contention that the delay in reaching Norfolk was owing to fault on her part. The ship not having arrived at Norfolk by February 16th, the charterers exercised the privilege which they had reserved, and canceled the charter for the return trip. Thereupon, the ship owner sought to recover a fair freight for the cargo of guano while the charterer claimed that, notwithstanding the cancellation of the charter, the ship owner was still bound to deliver the guano free of freight.

The court held that the cancellation of the charter gave the ship the right to claim freight upon the guano on the basis of quantum meruit. It stated that the inducement which led the ship owner to bring guano to Norfolk free was the stipulation of the charterers to pay a high freight price for the full and entire cargo which the ship was to receive at Norfolk, and that the cancellation of this charter, although within the right of the charterers, deprived the ship of the full cargo and the high freight for which she came to Norfolk. It noted, as in the instant matter, that there was nothing in the charter which expressly resolved the question before the court. Nevertheless, it felt that the terms of the charter which provided for "a voyage from Liverpool to Norfolk, and thence direct to Liverpool", in effect, treated as an entirety the trip both ways, and that there was no right to retain the part performed without payment, although so stated in the charter, when there had been a cancellation of the remainder of the charter containing the consideration for the free carriage. The cancellation of the charter party was therefore viewed by that court as an abrogation of every stipulation it contained, whether in favor of one party to it or the other.

The inability to repair the Chappell, a circumstance precluding it from earning a freight, must therefore be deemed to have abrogated the other provisions of the special average agreement, whether favorable to the libelant or the respondents. As an equitable disposition of this matter I am prompted to follow the general rule applicable where services are performed for a consideration which turns out to be impossible of performance or unenforceable.. Since it would be unjust to allow one party who has derived a benefit from the part performed to retain that without paying anything, an implied contract arises to pay the reasonable value of the services. See 3 Williston on Contracts, §§ 1972, 1973. Therefore the libelant is entitled to recover for the carriage of the cargo by the Hines the reasonable value of that service. This conclusion is also supported by the provisions embodied in the liberties clause of the Chappell charter.

While it was agreed at the trial of this matter to defer the calculation of amounts due libelant, if any, to a subsequent hearing, I deem it appropriate to note certain observations on this subject at this time. Any recovery on a quantum meruit basis cannot exceed, in any case, that which would have been earned by libelant had the special average agreement been performed since the libelant should not be in a more favorable position because of nonperformance. It was indicated, for example, by a witness for libelant that there was no established or customary freight rates for a carriage of a cargo of manganese from Dakar, although, if such a rate could be ascertained, it would probably be much higher than from Takoradi. Since the second freight to be earned under the special average agreement contemplated a carriage from Takoradi, the Takoradi rate fixed by the parties would establish a maximum beyond which the libelant could not recover. This is not to indicate my approval of libelant's view that it is entitled to recover for the Hines carriage as if there had been for it a separate and independent charter similar in terms to the original Chappell charter but without the necessity of taking any deductions for commissions, dispatch, etc. from the total contract price as provided in the original Chappell charter.

It is evident that the established freight rate from Takoradi reflects the inclusion of conventional deductions. In the calculation of the quantum meruit award the libelant should not have the benefit of charges normally paid by it. Thus, even though no commissions were paid for this carriage, a deduction should be taken for their usual amount from the freight. In addition, the respondents are entitled to a credit for dispatch and discharge on the Hines cargo estimated on such terms and charges as are customarily allowable which, in this case, would be the standards set forth in the original Chappell charter. In the light of the dispute at the trial between the parties as to the accuracy and validity of the amounts reserved by respondents to satisfy the credits claimed by them further proofs must be submitted at another hearing as indeed it was proposed at the trial.

In addition the libelant must recover its freight for the original voyage of the Chappell as if it had been abandoned, but with modifications. In this view ordinarily there would have been no dispatch or discharge to be claimed against the fixed rate for the cargo was transshipped from the Chappell to the Hines. However, allowance against the fixed rate for discharge and dispatch of this one cargo shall be reflected, as previously noted, in the quantum meruit calculations of the Hines carriage. The cost of transshipment of the cargo from the Chappell to the Hines is not recoverable in this suit. The libelant has made no references to or claim for it and apparently it falls into the allowance earned by the Hines while waiting and loading at Dakar to be recognized in the general average. This was contemplated by the special average agreement and while that contract dissolved yet the libelant should not profit to a greater extent than provided by it.

The libelant challenges the right of respondents to deduct for commissions from the aggregate freight due on the Chappell

charter, asserting that the commissions were a liability of the vessel. Exploration of the merits of this issue was deferred at the trial on the assumption that the question would be resolved at a later hearing to be held for the purpose of calculating damage. It was also implied that the parties could perhaps compose their differences as to this item pendente lite. If they still contest the item of commission the merits of the question should be litigated at a further hearing in this matter, provision for which will be made herein.

The complexity of the calculations designed to be made as a result of this opinion is such that the court deems it necessary to conduct another hearing to frame clearly the problem to be submitted. Monday, October 13, 1952, at 10 a. m., in Courtroom No. 2 in the federal building at Trenton, New Jersey is fixed as the day for such hearing, at which time the matters requiring further proofs as heretofore mentioned, will be considered.

■ The disposition of the suit outlined herein refutes the cross-libel of the respondent, Union Carbide, that the attachment of the cargo was so arbitrary, excessive and illegal as to warrant recovery of the damages claimed by it. Hence it will be dismissed.

Settlement of an order for judgment on this opinion should be deferred pending the further hearing as fixed herein.