**PHILLIPS PUERTO RICO CORE, INC., Plaintiff-Appellant,**

v.

**TRADAX PETROLEUM LTD., Defendant-Appellee.**

No. 618, Docket 84–7789.

United States Court of Appeals, Second Circuit.

Argued April 8, 1985.

Decided Sept. 16, 1985.

Terry L. Stoltz, New York City (Lance A. Warrick, Esq., Burlingham Underwood & Lord, New York City, of counsel), for appellant.

Patrick V. Martin, New York City (Richard H. Webber, Isabelle B. Roux, Hill Rivkins Carey Loesberg O'Brien & Mulroy, New York City, of counsel), for appellee.

Before MANSFIELD, KEARSE and PRATT, Circuit Judges.

MANSFIELD, Circuit Judge:

Phillips Puerto Rico Core, Inc. ("Phillips"), which contracted to buy a cargo of naphtha, appeals an order and judgment of the Southern District of New York, Robert L. Carter, Judge, awarding over a million dollars in damages against it in favor of Tradax Petroleum, Ltd., for breach of its contract with Tradax. Phillips maintains that it was excused from performing because Tradax had failed to perform satisfactorily and because of the occurrence of an event of force majeure. We disagree and affirm.

This convoluted maritime controversy had its origins in early September 1981 when Phillips, a corporation organized under Delaware law with its principal place of business in Puerto Rico, agreed to buy 25–30,000 metric tons of naphtha from Tradax, a corporation organized under Bermuda law, with its principal place of business

in Switzerland. Tradax had just purchased the naphtha from another firm, Schlubach & Co., and the naphtha was located in Skikda, Algeria. The Tradax-Phillips contract, which was made by telephone and then confirmed by telex on September 3, 1981, specified that the sale was to be "C & F" (cost and freight) Guayama, Puerto Rico and that shipment was to be made between September 20–28, 1981. No dates for delivery were specified. The agreement incorporated the International Chamber of Commerce 1980 Incoterms, a set of standardized terms for international commercial contracts, which define a "C & F" contract as one in which the seller arranges and pays for the transport of the goods, but the buyer assumes title and risk of loss at the time of shipment. The contract was also to include Tradax's standard contract provisions "subject to [Phillips'] review and acceptance." These standard terms, including a force majeure clause and an arbitration clause, were not recited in the telex but were subsequently mailed by Tradax to Phillips with a confirming letter and arrived several weeks later.

Soon after the original contract was entered into a September 8, 1981, telex from Phillips to Tradax provided documentation and delivery instructions, giving the destination in Puerto Rico and listing Phillips as consignee. The telex confirmed that "title and risk of loss to products shall pass to buyer at the time product reaches the vessel[']s flange at the load port." On September 16 Tradax nominated the Oxy Trader, an integrated tug barge, as the vessel for the journey, and after determining that the Trader would fit in the Puerto Rico berth and was available at the correct times, Phillips accepted the nomination.

The Trader arrived at Skikda for loading on the afternoon of September 20, 1981, and loading commenced the following day. The naphtha was completely loaded by the early morning of September 24 and at 1030 hours that morning the ship embarked for Puerto Rico. Its bill of lading listed the destination as "Rotterdam for Order," apparently a common practice in bills of lading out of Skikda, regardless of the vessel's actual destination. The cargo was consigned to Schlubach, which endorsed the bill in blank on the reverse.

Meanwhile, the admiralty press revealed that an accident had befallen another integrated tug barge—the Oxy Producer—which was the sister ship of the Oxy Trader. A September 15 report indicated that the Producer had been damaged due to foul weather. On September 17 the press reported that the damage had been caused by a problem with the bumper pads cushioning the linkage between the tug and the barge part of that integrated vessel. Five days later the newspaper stated that the Producer had sunk on September 20. On September 24 a freight manager for Tradax in London telexed Tradax in Switzerland recounting an article of that day that stated that the sinking of the Producer was "focusing attention on the safety of using combination vessels for deepsea transport." The telex was sent at 1203 hours London time on September 24 (1303 hours Skikda time), about two and a half hours after the Trader had begun its transoceanic journey.

The Trader's voyage was cut short the following day when the ship was detained by the Coast Guard at Gibraltar for an inspection. Tradax relayed word of the delay to Phillips, which telexed back on October 1 that October 15 was the last acceptable delivery date. The next day, unbeknownst to Tradax, one Phillips office telexed another with the instruction that payment for the naphtha "should be withheld at the present time due to the delay." Three days later, Tradax telexed Phillips, objecting to Phillips' attempt to specify a delivery date. Tradax's position was that the naphtha had been sold under a shipment contract not a destination contract and that, as seller, Tradax ceased to bear responsibility for the goods when it transferred the goods to the carrier for shipment.

On October 7, Tradax received word that the Trader might have a latent defect similar to the problem encountered by the Pro-

ducer, that the authorities were not letting the Trader proceed, and that the naphtha cargo would have to be transshipped. Tradax relayed this message to Phillips.

On October 9, Phillips telexed Tradax stating that it was "declar[ing] force majeure," that it would "not make any payments under the contract until the event of force majeure abates," and that it was reserving the right to cancel the contract if delivery did not occur within 30 days. Tradax responded, reiterating its claim that its responsibility ended at the time of shipment and notifying Phillips that it would present the shipping documents for payment of the contract price the following day. Phillips again instructed its Puerto Rico office not to make payment if Tradax tendered the documents.

On October 13 a Tradax representative presented the shipping documents for payment at Phillips' Puerto Rico office. A Phillips employee examined the documents briefly—about 30 seconds according to Tradax's witness—and stated that they seemed to be in order but that he had been instructed not to pay. A telex back to Tradax that day reaffirmed Phillips' unwillingness to pay until the abatement of the claimed force majeure.

Shortly afterwards Tradax informed Phillips that the Trader would be at Lisbon for the transshipment and that Phillips should make arrangements accordingly. That same telex objected to Phillips' failure to pay for the naphtha on presentation of the documents but offered assistance with the transshipment without prejudice to Tradax's rights. Phillips then proposed to Tradax that it would pay half of the amount due when the naphtha was transshipped and the remainder on arrival. Tradax declined the offer. Phillips ultimately accepted Tradax's nomination of a vessel for the transshipment but subsequently learned that the owner of the ship had requested Tradax to indemnify the ship for the deviation between Rotterdam, the destination in the original bill of lading, and Puerto Rico. On learning of the Rotterdam destination in the original bill of lading, Phillips demanded a new bill of lading from Tradax.

Four days later, on November 9, Phillips informed Tradax that it was terminating the contract due to the "unseaworthiness" of the Trader, "discrepancies in the documents," and an "unreasonable delay" in performance. Although Phillips and Tradax representatives tried to negotiate a new contract by which Phillips would buy the naphtha on "delivery" terms as opposed to "shipment" terms, negotiations fell through when Tradax's management refused to accept that deal. The transshipment then began on November 13, with a bill of lading which left open the destination port. On November 19, Tradax informed Phillips that it would try to sell the naphtha on the open market and would hold Phillips liable for any damages. Tradax then sold the naphtha to a third party for $.88 per gallon, after first offering it to Phillips on condition that Tradax retain its right to claim in arbitration the difference between that price and the contract price. Tradax's total loss on the naphtha, compared to the contract price, was $911,-710.31, plus incidental damages.

Tradax then commenced arbitration in London. Phillips protested the arbitration on the ground that the arbitration clause among Tradax's standard contract terms was not included in the contract and it also filed for a declaratory judgment in the Southern District of New York before Judge Carter. Tradax counterclaimed in the New York suit for its damages and the parties agreed to let the litigation proceed in lieu of arbitration.

On August 1, 1984, Judge Carter filed his decision in the case, finding Phillips liable to Tradax for $1,039,330.99 plus prejudgment interest from October 13, 1981. The court held that Phillips had anticipatorily breached the contract by declaring its unwillingness to pay because of force majeure. In his view the Coast Guard detention did not fall within the reach of the force majeure clause and Phillips could not in any event invoke the clause since nothing prevented its performance of the con-

tract. The district court further rejected Phillips' claims that its performance was excused because Tradax chose an unsuitable ship and tendered defective documents. Finding that Tradax's mitigation was reasonable, the judge awarded damages with interest. From this judgment Phillips appeals.

## DISCUSSION

The 1980 Incoterms define a "C & F" contract as one in which:

> "[t]he seller must pay the costs and freight necessary to bring the goods to the named destination but the risk of loss of or damage to the goods, as well as of any cost increases, is transferred from the seller to the buyer when the goods pass the ship's rail in the port of shipment."

*Accord Madeirense do Brasil S/A v. Stulman-Emrick Lumber Co.*, 147 F.2d 399, 402 (2d Cir.) ("[C]ommercial usage, recognized by the courts and text writers, is that under a c. & f. contract the seller fulfills his duty on shipment of the goods, and that the risk thereafter is on the buyer unless other terms of the contract indicate a contrary intention."), *cert. denied*, 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982 (1945); G. Gilmore & C. Black, The Law of Admiralty 106–07 (2d ed. 1975); *cf. Steuber Co., Inc.*

*v. Hercules, Inc.*, 646 F.2d 1093, 1096–97 (5th Cir.1981) (cost, insurance, and freight (C.I.F.) contract).

As a "C & F" seller Tradax had two duties that are relevant here: to deliver the naphtha to an appropriate carrier with which it had contracted for shipment and to tender proper documents to Phillips.[1] Phillips in return was contractually obliged to pay for the naphtha when presented with the shipping documents by Tradax.[2] It is undisputed that after Tradax loaded the naphtha on the Oxy Trader and presented Phillips with the shipping documents on October 13, 1981, Phillips refused to pay for the cargo. If Tradax had adequately performed its contractual duties, Phillips' refusal to pay for the naphtha constituted a breach of the contract as of October 13, unless it was somehow excused from performing.

Phillips asserts several grounds for its failure to pay Tradax on October 13: (1) the existence of a "force majeure," (2) unreasonable delay in Tradax's performance, (3) discrepancies in Tradax's shipping documents, and (4) unsuitability (unseaworthiness) of the Oxy Trader. On the undisputed circumstances of this case, however, none of these theories suffice to excuse Phillips' failure to pay on Tradax's presentation of the documents.

---

1. The 1980 Incoterms require a seller, inter alia, to:

   "Supply the goods in confromity with the contract of sale...."

   "Contract on usual terms at his own expense for the carriage of the goods to the agreed port of destination by the usual route, in a seagoing vessel ... of the type normally used for transport of goods of the contract description, and pay freight charges...."

   "Load the goods at his own expense on board the vessel at the port of shipment and at the date or within the period fixed or, if neither date nor time has been stipulated, within a reasonable time, and notify the buyer, without delay, that the goods have been loaded on board the vessel."

   Except for any risk caused by the buyer's delay in specifying a port of destination or shipping date, "bear all risks of the goods until such time as they shall have effectively passed the ship's rail at the port of shipment."

   "At his own expense furnish to the buyer without delay a clean negotiable bill of lading for the agreed port of destination, as well as the invoice of the goods shipped. The bill of lading must cover the contract goods ... and provide by endorsement or otherwise for delivery to the order of the buyer....

   "A clean bill of lading is one which bears no superimposed clauses expressly declaring a defective condition of the goods or packaging."

2. The 1980 Incoterms provide that a "C & F" buyer must, inter alia:

   "Accept the documents when tendered by the seller, if they are in conformity with the contract of sale, and pay the price as provided in the contract."

   "Receive the goods at the agreed port of destination and bear, with the exception of the freight, all costs and charges incurred in respect of the goods in the course of their transit by sea until their arrival at the port of destination...."

   "Bear all risks of the goods from the time when they shall have effectively passed the ship's rail at the port of shipment."

### Force Majeure

Phillips first relies on the force majeure clause among Tradax's standard contract terms, which were to be included in the contract "subject to [Phillips'] review and acceptance"; the contract, however, did not actually arrive at Phillips' office for review until after the Oxy Trader left port. The standard force majeure clause reads:

> "FORCE MAJEURE: In the event of any strike, fire or other event falling with[in] the term 'Force Majeure' preventing or delaying shipment or delivery of the goods by the seller or occur[r]ing prior to shipment or delivery and preventing or delaying reception of the goods by the buyer, then the contract period of shipment or delivery shall be extended by 30 days on telex request made within seven days of its occur[r]ence. Should shipment or delivery of the goods continue to be prevented beyond 30 days, the unaffected party may cancel the unfulfilled balance of the contract. Should the contract thus be cancelled and/or performance be prevented during any extension to the shipment or delivery period neither party shall have any claim against the other."

We assume arguendo that this clause became part of the contract when Phillips invoked force majeure on October 9, 1981.

■ In construing the force majeure clause within this "C & F" contract, we are guided by several basic principles. Although parties may agree to vary the terms of "C & F" or C.I.F. contracts,[3] "the dominant outlines of the C.I.F. term are so well understood commercially that any variation should, whenever reasonably possible, be read as falling within those dominant outlines rather than as destroying the whole meaning of a term which essentially indicates a contract for proper shipment rather than one for delivery at destination. Particularly care-

ful consideration is necessary before a printed form or clause is construed to mean agreement otherwise." UCC § 2–320, Comment 14.

We also look to the basic purpose of force majeure clauses, which is in general to relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated. See, e.g., Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc., 729 F.2d 1530, 1540–42 (5th Cir.1984); Gulf Oil Corp. v. FERC, 706 F.2d 444, 452 (3d Cir.1983), cert. denied, 464 U.S. 1038, 104 S.Ct. 698, 79 L.Ed.2d 164 (1984). See generally 3A A. Corbin, Corbin on Contracts, § 642 (1960); Squillante & Congalton, Force Majeure, 80 Comm.L.J. 4 (1975). The burden of demonstrating force majeure is on the party seeking to have its performance excused, 3A A. Corbin, supra, § 642 at 73 & n. 41, and, as Judge Carter pointed out, the non-performing party must demonstrate its efforts to perform its contractual duties despite the occurrence of the event that it claims constituted force majeure. See, e.g., Gulf Oil Corp. v. FERC, supra, 706 F.2d at 452.

■ With these principles in mind, we cannot agree that Phillips' performance was excused by its invocation of force majeure. Even if the detention of the ship by the Coast Guard constituted force majeure, and we are inclined to agree with Judge Carter that it did not, that detention did not frustrate the purpose of the contract or prevent Phillips from carrying out its obligation under the terms of the parties' contract to make payment. Indeed, to hold that the force majeure clause may be interpreted to excuse the buyer from that obligation, as Phillips urges, would be to wholly overturn the allocation of duties provided for in "C & F" sales.[4] We do not find

---

**3.** "C & F" and C.I.F. contracts are in all respects identical except that in the latter, the seller pays the cost of insurance during the voyage as well as the cost of freight. See G. Gilmore & C. Black, supra, at 107; UCC § 2–320.

**4.** For example, Phillips' counsel contended at oral argument that notwithstanding the clear allocation of risk under "C & F" contracts the force majeure clause would have justified a refusal to pay by Phillips if the goods had been

any evidence that the parties intended such a result.

Phillips' proposed interpretation is clearly inconsistent with the "C & F" terms of sale in the contract itself, which were confirmed by the pre-shipment telex from Phillips, stating that "title and risk of loss to produces shall pass to buyer at the time product reaches the vessel[']s flange at the load port." This conclusion is further bolstered by Tradax's cross-examination of Kurt Goehman, one of the persons who originally negotiated the contract for Phillips. Goehman gave his commercial opinion that under "C & F" terms, such as those agreed on, the risk of loss passes to the buyer upon the cargo's being loaded and that if the goods should thereafter be destroyed or if the ship should be delayed, the buyer would not be excused from paying the seller;[5] the buyer would, however, have a claim against the carrier if the loss or delay were the fault of the ship. In sum, Tradax's only obligation regarding delivery of the goods was to deliver them to the carrier; events occurring thereafter were not its concern.

No contrary conclusion is suggested by the language of the force majeure clause. The clause was a standard Tradax term applicable both to delivery contracts and to shipment contracts such as this one. The language in the clause referring to a delay in delivery and to an extension in the "contract period" for delivery is simply inapplicable here where it was never the seller's duty to assure delivery and where the contract was utterly silent about any delivery date. Certainly this preprinted clause does not evince the parties' intention to revise the standard elements of a "C & F" sale. Moreover, the very manner in which the force majeure clause was handled belies any intention to effect radical change in the basic allocation of "C & F" duties. The clause was buried in a group of standard terms in the contract, which did not even

arrive at Phillips' offices for approval until after the naphtha was shipped.

The force majeure clause thus did not alter the design of the "C & F" contract by requiring Tradax to assure delivery of the naphtha at the ultimate destination in Puerto Rico before it would be entitled to payment. The authorities Phillips cites in support of its contention that a "C & F" seller retains responsibility for events after the time of shipment are plainly distinguishable. The court in *Gatoil International Inc. v. Tradax Petroleum Ltd.*, 1982 G. No. 118, Slip Op. at 24 (Q.B. July 31, 1984), stated "tentative[ly]" that a "C & F" seller could be liable for having "wrongfully delay[ed] the actual delivery of the goods," in that case by instructing a ship to wait outside the harbor at the port of discharge. Here, in contrast, the absence of any such wrongful conduct on Tradax's part makes such deviation from the standard "C & F" division of responsibility inappropriate. Phillips' other authority, *Harlow & Jones, Inc. v. Advance Steel Co.*, 424 F.Supp. 770, 776 (E.D.Mich.1976), is also inapt. That court was presented with a different question, which is not before us, i.e., whether timely delivery to a C.I.F. buyer might excuse late shipment by the seller. The court found that "delivery, not shipment ... primarily concerned" the buyer. No such findings were made here nor could they be, since the contract nowhere specified a delivery date. Moreover, the *Advance Steel* court found in favor of the shipper, holding that the buyer's premature repudiation of the agreement on grounds of anticipated delay in delivery amounted to a breach of contract. Thus the result was the same as that reached by the district court in the present case.

Phillips therefore has no viable claim that force majeure excused it from performance under the contract.

*Defects in the Documents*

There is equally little merit in Phillips' claim that it was excused from payment

---

lost at sea due to a tidal wave. This clearly is not the law. See p. 318, *supra.*

**5.** Goehman was "not quite sure," however, when asked whether it mattered if the delay were "one day or one week or one month."

under the contract because Tradax tendered defective shipping documents. While it is true that in a sale by documents the seller's tender of the documents is judged very strictly, *see* G. Gilmore & C. Black, *supra,* at 112–13, Phillips' objection to the documents here, as Judge Carter noted, "is an after-thought and must fail." Without having seen the shipping documents, Phillips twice instructed its agents that because of force majeure, they were not to pay Tradax when the latter presented the papers for payment. When Tradax presented the papers in Puerto Rico, a Phillips employee chose to give them only a cursory examination before stating that they seemed "okay," but that he had been instructed not to pay.

■ To the extent that the documents might have been defective because of the incorrect destination in the bill of lading, the denomination of Schlubach as consignee and the need for an assurance that Tradax had paid the freight charges, Phillips waived its right to rely on this belatedly alleged defect as justification for its nonpayment because it did not seasonably notify Tradax and particularize any defects so that Tradax could effect a timely cure. *See* UCC § 2–605(1); *cf. Corporacion de Mercadeo Agricola v. Mellon Bank International,* 608 F.2d 43, 48–49 (2d Cir.1979) ("[W]hen a bank offers one reason for refusing a draft on a letter of credit, and that reason is later refuted, it cannot at trial point to an entirely different reason for sustaining the refusal. Otherwise a bank could surprise the beneficiary of a letter of credit with a defense which might have been cured earlier."); *Uchitel v. F.R. Tripler & Co.,* 107 Misc.2d 310, 317, 434 N.Y. S.2d 77, 81–82 (Sup.Ct.1980) (per curiam) (failure to particularize defects in goods). Under the terms of the contract, as modified by a confirming letter sent by Tradax to which Phillips never objected, *see* UCC § 2–207(2)(c), payment was due in cash by telegraphic transfer on the same day as the presentation of the documents. Phillips' breach of that obligation bore no relation to its telex nearly a month later formally cancelling the contract on broader grounds.

Nor is Phillips aided by UCC § 2–510(1), which provides that "[w]here a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance." Assuming this section applies to a tender of defective documents (see Official Comment 2) the alleged defect here was immaterial. The bill of lading, although to Schlubach's order, was endorsed in blank by Schlubach, thus making Phillips the consignee. Nor is Phillips excused from performance by the bill of lading's description of the destination of the shipment as "Rotterdam for Order," wording that was commonly used with respect to shipments from Algeria in order to meet Common Market requirements. At all times the shipment was destined for Puerto Rico, not Rotterdam, and Tradax from the outset instructed the master accordingly. Finally, nothing in the parties' contract obligated Tradax to pre-pay freight. On the contrary, part II, Clause 2 of the charter, which governed the time when freight was to be paid by Tradax, provided that payment might be made "upon delivery of cargo at destination."

■ In any event, even if we were to accept Phillips' contention that its time for performance had not arrived because Tradax had failed to tender conforming documents, Phillips' earlier refusal to pay on the grounds of force majeure constituted an anticipatory breach of the contract. As early as October 9 Phillips declared its intention to refrain from payment until the event of force majeure abated, and it restated these sentiments repeatedly thereafter, even though it was beyond its rights in so insisting. Phillips anticipatorily breached the parties' contract when it "demand[ed] ... a performance to which [it had] no right under the contract and state[d] definitely that, unless [the] demand [was] complied with, [it would] not render [the] promised performance." 4 A. Corbin, *supra,* § 973, at 910. At least by October 13 its intention to repudiate was unquestionably "positive and unequivocal." *Tena-*

*vision, Inc. v. Neuman,* 45 N.Y.2d 145, 150, 408 N.Y.S.2d 36, 38, 379 N.E.2d 1166, 1168 (1978); *see* 4 A. Corbin, *supra,* § 973, at 911. Tradax was thus excused from all performance under the contract, *see Tena-vision, Inc. v. Neuman, supra,* 45 N.Y.2d at 150, 408 N.Y.S.2d at 38, 379 N.E.2d at 1168, including any needed cure in its tender of documents.

### The Suitability of the Oxy Trader

 Phillips was not relieved of its contractual obligation because of Tradax's selection of the Oxy Trader. The relevant provision in the 1980 Incoterms requires that a "C & F" seller contract for the carriage of the goods "in a seagoing vessel ... of the type normally used for the transport of goods of the contract description." Although the Oxy Trader, an integrated tug barge, was of novel design in that the tug and the barge were married together, this feature did not disqualify the Trader as a ship that might "normally" be used for transport. A new design would not carry with it such a disqualification. Indeed, the status of the Trader as a ship normally used for transport was confirmed by the United States Coast Guard's certification of it for ocean transport and for carriage of comparable cargos and by Phillips' own approval of the choice of the ship. Moreover, the Oxy Trader had safely sailed on transatlantic trips.

There is similarly no basis for concluding that Tradax should have known before the ship left port that the Trader was likely to be problematic. The defect in the Trader was a latent one, and Tradax was not notified of the attention being focused on the safety of integrated barges for deepsea transport until after the Trader had left port. As Judge Carter recognized, prior publicity merely reflected the occurrence of an accident to a ship of the same type, not an alert that there were problems with integrated tug barges in general.

The remaining claims raised on appeal need little discussion. Phillips has not persuaded us that Tradax in any way failed to mitigate its damages adequately. Tradax's

claim that Judge Carter awarded insufficient prejudgment interest is not properly before us, as Tradax failed to file a notice of cross-appeal. *See Lettsome v. United States,* 434 F.2d 907, 909–10 (5th Cir.1970).

The judgment of the district court is affirmed.