**COSTA LINE CARGO SERVICES, INC., as Agent for Costa Line, Plaintiff,**

v.

**McGRAW–EDISON COMPANY, Defendant.**

**No. 84 Civ. 3614 (RLC).**

United States District Court, S.D. New York.

Nov. 12, 1985.

Brauner Baron Rosenzweig Kligler Sparber & Bauman, New York City, for plaintiff; Howard L. Simon, Francis P. Manfredi, of counsel.

Freehill, Hogan & Mahar, New York City, for defendant; Robert L. Mahar, of counsel.

OPINION

ROBERT L. CARTER, District Judge.

This case involves litigation for the payment of surcharges totalling $94,800 for detention and diversion of some trucks

carrying containers with defendant's cargo to various delivery points in Iraq, other than Baghdad or Mosul, the contracted points of delivery. Plaintiff seeks to assess some $42,600 in diversion charges and $52,200 in detention charges. Both sides move for summary judgment. Although there is some disagreement by each party as to the other's 3(g) statement, the basic facts are not in dispute, and accord on the disputed facts is not essential to a determination of the summary judgment motions. Accordingly, we proceed to their disposition.

Defendant, McGraw-Edison Company ("McGraw"), sold a quantity of air coolers and parts to the Iraq Trading Company during the latter part of 1981 and the early part of 1982. The contract called for sale f.o.b. Phoenix, Arizona, where defendant's manufacturing plant was located, and delivery to Baghdad and Mosul by way of a Turkish port. The transaction involved a total of 596 containers of air coolers and 8 containers of parts—510 containers were to be delivered to Baghdad and 94 containers were to be delivered to Mosul.

Two letters of credit were issued by the Iraq Trading Company in defendant's favor with the Rafidian Bank in Baghdad and Chase Manhattan Bank in New York as the advising bank. One letter of credit covered the shipments going to Mosul and the other covered the cargo scheduled for delivery to Baghdad. At the time of each of the listed shipments, bills of lading from Costa Line Cargo Services, Inc. ("Costa Line") covering the cargo and relating to the particular ocean vessel and voyage and the applicable invoice, legalized by the Embassy of Iraq in the United States, were presented to the Chase Manhattan Bank and draw downs against the letters of credit were effected in favor of the defendant in the amounts of the applicable invoice.

Plaintiff, Costa Line, and defendant entered into a contract of carriage of the cargo by sea to Iskenderun, Turkey, and then overland to Baghdad and Mosul. Costa Line in turn entered into agreement with the Makzume Shipping Agency for the overland transportation of the cargo from Iskenderun to the two designated delivery destinations in Iraq. The cargo was shipped in plaintiff's container vessels to the Turkish port and overland by truck to Iraq at a cost of $6,700 per container.

The cost of the inland shipment charged by plaintiff was $2,305.40 per 40 foot container. Costa Line's normal charges for such inland shipment (Iskenderun to Baghdad) was $2,240 per 40 foot container of up to 35,200 lbs, as evidenced by its tariff on file with the Federal Maritime Commission. The surcharge for this inland shipment was $65.40 per container for a total surcharge of $39,501.60. (Defendant's Opposition and Reply Affidavit at 5–6).

The cargo arrived at Iskenderun on plaintiff's vessels, was discharged and loaded onto trucks for transportation to Iraq. Inland way bills were issued listing defendant as shipper and the Iraq Trading Company as receiver. The inland route to Baghdad involved crossing the Turkey/Iraq border and proceeding approximately 600 kilometers to Iraq Customs Authority in Baghdad, where the diversions and detention charges, which plaintiff seeks to recover from defendant, were incurred.

The cargo arrived at Iskenderun on 5 shipments: on March 5, 1982, Spetses Island arrived carrying 129 containers—53 were diverted; on May 6, 1982, the Costa Mediterranea (Voyage 1) arrived carrying 108 containers—none was diverted; on June 5, 1982, the Costa Atlantica (Voyage 2) arrived carrying 126 containers—none was diverted; on July 8, 1982, the Costa Mediterranea (Voyage 2) arrived carrying 122 containers—40 were diverted; and on August 6, 1982, the Costa Atlantica (Voyage 3) arrived carrying 119 containers—53 were diverted.

On arrival at Iskenderun, the containers were off loaded from plaintiff's vessels onto trucks for inland transportation to Baghdad and Mosul. When the trucks arrived at Iraq Customs Authority in Baghdad, some 600 kilometers from the Turkish/Iraq border, a representative of the Iraq Trading Company was present,

and this representative would direct the truckers from time-to-time to divert part of the shipment scheduled for delivery to Baghdad to other locations in Iraq.

These directives, plaintiff argues, had the weight of the Iraq Customs Authority which had to approve delivery to any place other than that listed on the way bill, which was Baghdad. Moreover, plaintiff contends, it could not have delivered the cargo to Baghdad contrary to the directive to deliver the cargo to another destination because the cargo would have been subject to damage or theft if discharged in Baghdad and not accepted by the Iraq Trading Company. The truckers had to remain with the cargo until advised by the Iraq Trading Company that space was available for unloading either in Baghdad or at the diverted destination. Two days' free time was allowed for delivery. Thereafter, for each day of waiting, a demurrage charge of $100 per day, per truck was incurred. Because a state of war existed in Iraq, telephone communications from Iraq to the outside world were virtually non-existent, rendering it impossible for plaintiff to contact defendant for permission to incur these costs before abiding by the instructions of the Iraq officials. (Aff. of Ronald Makzume).

Defendant contends that at the time the diversion and detention took place, it was no longer the owner of the cargo. Plaintiff counters that while ownership had technically passed from defendant, it maintained a proprietary interest in the containers since prior to shipment defendant had executed a performance bond in the form of a standing letter of credit in the amount of $1 million or roughly 10% of the purchase price of the goods. The bond was to be discharged only on confirmation from the Iraq Trading Company to the issuing bank of the arrival and inspection of the last shipment.

**Determination**

◼ Since the contract was f.o.b. Phoenix, Arizona, ownership of the containers had already passed to the Iraq Trading Company when the various shipments arrived at the Turkish port and were subsequently diverted or detained during the inland journey. *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.,* 782 F.2d 314 (2d Cir.1985); *Madeirense do Brasil S/A v. Stulman-Emrick Lumber Co.,* 147 F.2d 399, 402 (2d Cir.1945) ("under a c.&f. contract the seller fulfills his duty on shipment of the goods, and that the risk thereafter is on the buyer unless other terms of the contract indicate a contrary intention"), *cert. denied,* 325 U.S. 861, 65 S.Ct. 1201, 89 L.Ed. 1982 (1945).

The existence of the performance bond does not change that. The cases cited by plaintiff, *C.H. Leavell & Co. v. Hellenic Lines, Ltd.* 1969 AMC 2177, and *International Packers Ltd. v. Federal Maritime Commission,* 356 F.2d 808 (D.C.Cir.1966), do not appear to be on point. In one, the surcharge resulted from an unexpected occurrence during the voyage and in *International,* the shippers, aware that a strike had closed United States east coast ports, requested the carrier not to unload the cargo at available alternate ports, thus authorizing it to keep the cargo, which was perishable, under refrigeration on the carrier's vessel until an east coast port became available. Inferentially, at least, the shippers had in fact agreed to the surcharge. There are no such facts on this record to warrant a conclusion that defendant had consented to the added tariff. The action was unquestionably unilateral. The issue is whether plaintiff may unilaterally impose these surcharges on the defendant.

◼ Under ordinary circumstances, a shipping carrier is held to its published tariff. Plaintiff is subject to the Shipping Act of 1916, as amended in 1984, 46 U.S.C. § 1701 *et seq.* ("the Act"). Under the Act plaintiff, as a common carrier by water, is required to file its tariffs with the Federal Maritime Commission, to keep such tariffs open for public inspection showing all its rates and charges, and to adhere to the rates, charges and services as set forth in its tariffs. Any rules or regulations which may affect or vary the rates the tariffs

disclose must be set out. The carrier cannot charge a greater or lesser rate for its services than the tariffs require.

 Plaintiff complied with the requirements of the Act and filed with the Commission tariffs covering the transportation of the cargo involved here. The tariffs provided freight rates and other charges for the inland movement in 40 foot containers from Phoenix to Houston, ocean carriage from Houston to Iskenderun, Turkey and inland movement from Iskenderun to Baghdad and Mosul, Iraq. Costa Line's Intermediate Tariff No. 1, FMC–33, effective January 1, 1982, through December 31, 1982, and Costa Line's Bill of Lading and Rules and Regulations Tariff FMC–26, effective January 1, 1982, to December 31, 1982, were the filed tariffs governing the movement of this cargo. The applicable tariff has the effective force of law. *State of Israel v. Metropolitan Dade County, Florida*, 431 F.2d 925, 928 (5th Cir.1970); *Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939). Deviation from its terms is prohibited. *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97–98, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). The carrier cannot contract with a shipper for a special service or rate unless the same is published. The purpose of this requirement is to require the carrier to render its services to all on like terms. *Kansas City Southern R.R. Co. v. Carl*, 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913); *United States v. Interstate Commerce Commission*, 198 F.2d 958, 966 (D.C.Cir.1952).

 Plaintiff was required by the Commission to publish a through route and through rates. 46 C.F.R. 536.8(b). A through route is defined as an "arrangement for the continuous carriage of goods between points of origin and destination, either or both of which lie beyond port terminal areas." 46 C.F.R. 536.8(a)(1).

A through rate is defined as "a rate expressed in a single number representing the charge to the shipper by a carrier or carriers holding out to provide transportation over a through route." 46 C.F.R. 536.-8(a)(2).[1]

The rate listed was $6,700 Phoenix to Baghdad for each container. The tariff makes no mention of detention or deviation charges. Under applicable law, the surcharges cannot be exacted. *See St. Louis Southwestern Railway Co. v. Garvey Elevators, Inc.* 505 F.2d 625 (5th Cir.1974); *American Trading and Produce Corp. v. Shell International Marine, Ltd.*, 453 F.2d 939 (2d Cir.1972).

Plaintiff relies, at least in part, on Clauses 6 and 7 in its bill of lading. Clause 6 allows for discharge of goods other than at the port of discharge where because of "risk ... detention, damage, delay or disadvantage" to the ship or cargo, "in the judgment of the carrier", it is "unsafe, imprudent or unlawful" to proceed to "discharge the goods at the port of discharge". In such a case reasonable compensation may be exacted by the carrier.

The clause seems clearly applicable to the ocean voyage portion of the transportation.

Clause 7 reads:

The Carrier, Master and ship shall have liberty to comply with any orders or directions as to loading, departure, arrival, routes, ports of call, stoppages, discharge, destination, delivery or otherwise howsoever given by the government of any nation or department thereof or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having under the terms of the war risk insurance on the ship, the right to give such orders or directions.

---

1. The above is found in the 1983 edition of C.F.R. 500 to end (Shipping). In the more recent publication of the shipping regulations, 46 C.F.R. 536 has been entirely eliminated. However definitions of a through rate appear at 46 C.F.R. § 550.2x and § 580.8(a)(1) and a through route is defined at 46 C.F.R. § 550.1(y) and § 580.8(a)(2). The definitions are substantially the same as in the 1983 regulations.

Delivery or other disposition of the goods in accordance with such orders or directions shall be a fulfillment of the contract voyage....

In addition to all other liberties herein the Carrier shall have the right to withhold delivery of, reship to, deposit or discharge the goods at any place whatsoever, surrender or dispose of the goods in accordance with any direction, condition or agreement imposed upon or exacted from the Carrier by any government or department thereof or any person purporting to act with the authority of either of them. In any of the above circumstances the goods shall be solely at their risk and expense and all expenses and charges so incurred shall be payable by the owner or consignee thereof and shall be a lien on the goods.

Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment, pp. 16, 17. This clause also has applicability to the ocean or marine portions of the voyage.

Moreover, there was no danger or risk involved here and no emergency circumstances. What appears to have occurred is that the Iraq Trading Company had the truckers divert cargo from time to time to suit its convenience in having some of the air coolers delivered at places other than the contracted destinations of Baghdad or Morsul. Plaintiff complied with these requests and now seeks to pass expenses incurred on to defendant rather than the Iraq Trading Company.

Plaintiff charged defendant $65.40 more per container for the inland route from Iskenderun to Baghdad in apparent contemplation of the chaos and resulting difficulties that might be encountered in the final stages of its inland carriage of these air coolers in Iraq because of Iraq's state of war. Perhaps it should have set a higher tariff. In any event, it is not entitled to receive any additional surcharge from defendant.

Defendant's motion for summary judgment is granted.

IT IS SO ORDERED.