## EM CHEMICALS, a DIVISION OF EM INDUSTRIES, INC., Plaintiff,

v.

## S.S. "SLOMAN NAJADE", her engines, boilers, etc., Partenreederei m.s. Sloman Najade, Companhia De Navegacao Lloyd Brasileiro, International Terminal Operating Co., Inc., Defendants.

### No. 85 Civ. 2367 (JFK).

United States District Court, S.D. New York.

March 31, 1987.

---

Bigham Englar Jones & Houston, New York City, for plaintiff; John E. Cone, Jr., William R. Connor, III, of counsel.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for defendants; Martin B. Mulroy, of counsel.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

KEENAN, District Judge:

### Background and Findings of Fact

This case involves the disappearance of seven pallets of a blood pressure-controlling chemical, known as Rutin, from a shed at the South Brooklyn Marine Terminal sometime in June 1984. The facts set forth below are drawn from the Pretrial Order and Agreed Findings of Fact of the parties and their uncontested submissions, unless otherwise indicated.

On May 10, 1984, plaintiff, EM Chemicals, a division of EM Industries, Inc. (here-

after "EM"), ordered 80 cartons of Rutin from Merck Brazil. On May 25, 1984, Merck Brazil advised EM that the Rutin had departed Brazil on May 24, 1984, aboard the S.S. "SLOMAN NAJADE." Merck Brazil also advised that the ship had an estimated time of arrival in New York on June 7, 1984. Pursuant to the purchase agreement, Merck Brazil advised EM that the documents, including the bill of lading necessary to clear the subject shipment, would be sent to EM's bank, European American Bank.

On July 2, 1984, EM received documentation from the European American Bank including a bill of lading, Brazilian commercial invoices, special customs invoices, and a certificate of origin. After receiving the documentation, EM sent its trucker to South Brooklyn Marine Terminal to pick up the cargo. The South Brooklyn Marine Terminal is where the Rutin had been discharged and was to be available for pickup. On July 19, 1984 after several attempts to pick up the Rutin, EM's trucker was given a delivery order stamped "Cannot Locate" by a Customs official.

According to Lloyd and International Terminal Operating Co., Inc. (hereafter "ITO"), the "SLOMAN NAJADE" arrived in New York at the South Brooklyn Marine Terminal on June 6, 1984. While the exact date of discharge of the subject cargo is unknown, according to ITO records, it stripped the cargo from Lloyd's container No. INTU 210–151–2 on June 11, 1984, placing the cargo at Door 15 of the shed at the South Brooklyn Marine Terminal. "Free time" expired and demurrage charges began to accumulate on June 18, 1984. "Free time" is that period of time that cargo may be left on a pier after discharge without the incursion of storage charges.

On March 13, 1985, EM was contacted by one Brian Fitzpatrick from South Africa. Mr. Fitzpatrick said that he was in possession of seven pallets of EM-marked Rutin and that he had purchased the same at a South African customs sale. EM, prior to March 13, 1985, had never heard of Mr. Fitzpatrick and did not know who he was.

EM attempted to negotiate for the purchase of the Rutin which Mr. Fitzpatrick claimed to have. There was no response to EM's offer and EM was unable to purchase this Rutin. All attempts by EM and a South African company it hired to locate Mr. Fitzpatrick met with failure.

There are indications that the subject cargo was loaded aboard the MV "VERGE-LEGEN" which arrived at the South Brooklyn Marine Terminal on June 28, 1984, and sailed for South Africa, the cargo being discharged at Durban on July 30, 1984. There is no indication as to when, how or by whom the subject cargo may have been loaded aboard the "VERGELE-GEN." ITO has no records concerning its ultimate disposition of the subject cargo. At the time of its disappearance, the market price of Rutin was rising.

Defendants urge that the United States Carriage of Goods by Sea Act ("COGSA") 46 U.S.C. § 1304(5) limits their liability to a total amount of $3,500, i.e. $500 per pallet. They cite to paragraph 2 of the bill of lading the "Clause Paramount" which incorporates COGSA and in pertinent part reads as follows:

2. CLAUSE PARAMOUNT— ... The Provisions cited in said Act(s) shall (except as may be otherwise specifically provided herein) also govern before the Goods are loaded on and after they are discharged from the ship provided, however, that the Goods at said times are in the actual custody of the Carrier.

Carrier is defined as follows in paragraph 1b of the bill of lading:

'CARRIER' means Companhia De Navegacao Lloyd Brasileiro and the ship and/or her owner, demise charter, if bound hereby, the time charterer and any substituted carrier whether any of them is acting as carrier or bailee.

Plaintiff, sought to establish that the bill of lading (Plaintiff's Exhibit 1 (hereafter PX 1)) was illegible because (1) the print was so small and (2) it is printed in black on a blue background. Plaintiff sought to do this through the testimony of a printing expert, Courtney Brown, an executive of Court Press. The print, although quite

small, can be read without a magnifying glass. In any event PX 22, a short form bill of lading, with a package limitation of $500 is clearly legible. The Court does not view the print size of PX 1 as in any way controlling in this case.

It should be noted that on October 22, 1986, ITO and Lloyd Brasileiro entered into a hold harmless agreement whereby, *inter alia,* ITO assumed the defense of all claims against Lloyd Brasileiro arising out of this action and ITO agreed to indemnify and pay Lloyd Brasileiro in full for any judgment rendered against Lloyd Brasileiro in this action.

Plaintiff argues that ITO is liable in full for the loss of the Rutin in question and the parties have agreed that this would amount to $33,129.55 if there is no package limitation.

### Conclusions of Law

Plaintiff contends that the bill of lading fails to extend any COGSA limitation of liability since by the terms of the bill of lading COGSA is extended to post-discharge periods only if the goods are in the actual custody of the "Carrier," a defined term in the bill of lading. Plaintiff urges that the definition of "CARRIER" in the bill of lading does not include ITO.

The defense counters by citing two Second Circuit opinions *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800 (2d Cir. 1971) and *Allied Chemical International Corp. v. Companhia de Navegacao,* 775 F.2d 476 (2d Cir.1985), *cert. denied,* 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986). In *Leather's Best,* the late Judge Friendly wrote:

> While the loss of container occurred after the act of carriage had been completed and the container had been discharged from the Mormaclynx, that does not mean that the contract of carriage, obviously a maritime contract, was at an end; the contract continues to govern the relationship between a shipper and a carrier after discharge but before delivery.

451 F.2d at 807.

Further "upon landing the cargo, the carrier assumed the status of bailee and continued to occupy that status, remaining liable for the cargo's safe delivery, regard-less into whose hands it placed the cargo, unless it terminated its liability by placing the cargo in a public dock or warehouse in accordance with the bill of lading." *Id.* at 812.

Under the terms of the contract between Lloyd and ITO (DX H, para. 9B) the latter was "acting as the agent of the Carrier, and ... is not to be considered as a bailee of the cargo." The Court concludes that under paragraph 9 of the Bill of Lading, delivery never took place and the goods were in the custody of the agent, ITO, when the loss occurred. Paragraph 3 of the Bill of Lading extends the package limitation to agents and terminal operators. This extension is perfectly proper. *See Generali v. D'Amico,* 766 F.2d 485, 487 (11th Cir.1985).

Plaintiff's argument that a constructive delivery took place and that therefore the limitation of liability in the bill of lading "no longer governed the rights and responsibilities of the parties" (Plaintiff's Post-Trial Brief, p. 8) ignores the fact that the goods were in custody of the Carrier's agent when they were lost. Under the facts of this case, the contract of carriage was not completed and the COGSA limitation of $500 per pallet applies.

The Court directs that judgment be entered against the defense in the amount of $3,500 together with interests and costs.

SO ORDERED.