**RAINBOW NAVIGATION, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 86–4343.**

United States District Court, D. New Jersey.

July 13, 1990.

---

George Koelzer, Ober, Kaler, Grimes & Shriver, Edison, N.J., for plaintiff.

Damon Miller, Trial Atty., Civil Division U.S. Dept. of Justice, Wash., D.C., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This admiralty suit concerns the carriage of United States government cargo between Norfolk, Virginia and Njardvik, Iceland in September—October 1984. The principal controversy relates to the interpretation of the Bill of Lading which controls this carriage.[1] Plaintiff, Rainbow Navigation, Inc. ("Rainbow"), seeks to recover compensation from defendant, the United States of America, for overhead, loss of freight revenues and expenses incurred by it while its vessel was strikebound in Njardvik, Iceland, for a period of over twenty-two days.

A bench trial was commenced on June 28, 1989. Due to scheduling difficulties, the trial was conducted for eight days over a ten month period. The trial proceeded on November 11, 1989, December 27, 1989, December 28, 1989, December 29, 1989, January 3, 1990, April 3, 1990, and concluded on April 4, 1990.

This court has jurisdiction pursuant to the Suits in Admiralty Act, 46 U.S.C. App. § 741—752.

I now make my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a), based on testimony and certain documents which the parties offered into evidence at trial.

## FINDINGS OF FACT

I will break down my findings of fact into three parts, describing: (1) the background of this case; (2) occurrences prior to sailing; and (3) the strike in Iceland.

### I. *The Background of this Case*

The Military Sealift Command, (MSC), Department of the Navy is the single manager operating agency for sealift service within the Department of Defense (DOD). As part of that responsibility, MSC arranges ocean transport in the foreign and domestic offshore commerce of the United States for all DOD and DOD sponsored cargoes from commercial U.S. flag ocean carriers (Stipulated fact 1). By delegation, the Commander Military Traffic Management Command, Department of the Army (MTMC), has responsibility for, among other things, all functions related to the bookings of cargo for carriage by commercial ocean carriers. MTMC served as the contracting officer, the paying officer and the legal advisor (Tr. 673). All freight bills for the movement of cargo between the U.S. east coast and Iceland are paid by the MSC subordination area command, MSC, Atlantic (COMSCLANT). The Naval Supply Systems Command (NAVSUP) is responsible for the coordination of the resupply of U.S. Naval Stations worldwide. As part of this responsibility, NAVSUP provides transportation and funding, monitors the funds, and tracks any problems in the resupply transportation pipeline.

In 1984, plaintiff, Rainbow operated as an ocean common carrier in the U.S. east coast/Iceland trade, offering regularly scheduled service between Norfolk, Virginia, and Iceland. At all times pertinent to this matter, Rainbow operated one vessel, The Rainbow Hope, in this trade. This was Rainbow's only vessel involved in ocean carrier transportation. In September of

---

**1.** The bill of lading has three purposes: (1) it acts as evidence of the contract of carriage between the shipper and carrier; (2) it acts as a receipt for the goods; and (3) it acts as a document of title, if it is negotiable (Tr. 191). *See* Thomas J. Schoenbaum, ADMIRALTY & MARITIME LAW, § 9–8 at 298 (West 1987).

1984, The Rainbow Hope was the only U.S. flag vessel in the U.S. east coast/Iceland trade. (Tr. 356, 391). At all times relevant, The Rainbow Hope was bareboat chartered[2] to Rainbow by the Maritime Administration, Department of Transportation. Under the charter, Rainbow agreed that monthly charter payments would be due and payable regardless of whether the vessel was employed (Stipulated fact 8). Virtually all cargo carried by Rainbow in this trade belonged to the U.S. government. On the voyage in question, approximately ninety-eight percent of the cargo carried belonged to the government. (Tr. 391).

In 1984, all cargo booked by MTMC with Rainbow and Icelandic shipping companies was booked on a common carriage basis under government bills of lading pursuant to their commercial tariffs on file with the Federal Maritime Commission. When military cargo is booked under a commercial tariff, MTMC prepares and uses government bills of lading, although it is customary that both a U.S. government bill of lading and a commercial bill of lading be issued (Tr. 419). The parties agree that the contract of carriage in this case was governed by a government bill of lading and a Rainbow bill of lading. (Stipulated facts No. 13, 18). In this case, the government and Rainbow bills of lading designate Njardvik, Iceland as the point of destination, and the terms and conditions of the freight carriage are governed by the government bill of lading and Rainbow Tariff No. 1,[3] as duly filed with the Federal Maritime Commission, which incorporated the Rainbow Bill of Lading. Rainbow Tariff No. 1, as duly filed with the Federal Maritime Commission, which incorporated the Rainbow Bill of Lading.

The U.S. government bill of lading states in its terms and conditions that it is governed by the regulations of Title 41, subpart 101–41.3, of the Code of Federal Regulations, ("CFR"). Except as provided in 41 CFR § 101, or as otherwise stated on the government bill of lading, the government bill of lading is also subject to the same rules and conditions as govern commercial shipments made on the usual form provided by the carrier. (Exhibit P–1). The government bill of lading imposed upon Rainbow, the carrier, the obligation to receive the cargo, carry it from Norfolk to Njardvik, and deliver the cargo in good order and condition to the consignee (Exhibit P–1). Under the government bill of lading and applicable regulations and statutes incorporated therein, freight is not earned until delivery of the cargo at the designated destination. 41 C.F.R. § 101–41.302–3.[4]

In addition to the government bill of lading, however, Rainbow's bill of lading applies to the parties' contract of carriage. There are three clauses in the Rainbow bill of lading at issue in this case: clauses 5(a), 5(e) and 4(b). The liberties clause, found in the Rainbow bill of lading, clause 5(a), states:

---

**2.** A bareboat charter entails the transfer of possession and control of the vessel from the owner to the charterer for the period covered by the contract. The charterer obtains the right to run the vessel, to carry whatever cargo he chooses, and select his own master and crew. This type of charterer is often termed an owner, *pro hac vice. Id.,* § 10–1 at 382; *see,* T.J. Schoenbaum & A.N. Yiannopoulos, ADMIRALTY & MARITIME LAW, 431 (1984). In this case, Rainbow acquired the Rainbow Hope pursuant to a bareboat charter from the Maritime Administration, Department of Transportation. This charter renders Rainbow the owner of the vessel, *pro hac vice.*

**3.** A tariff is a document filed with the Federal Maritime Commission, ("FMC"), which discloses the terms and conditions of transportation. Under the Shipping Act, anyone who holds themselves out as a common carrier must file their rates, terms themselves out as a common carrier must file their rates, terms and conditions of carriage with the FMC (Tr. 307). A carrier cannot demand a fee for its carriage of goods greater than that filed with the FMC. *See infra,* note 9, at p. 182.

**4.** "Freight" is the money paid by a shipper (the government) to the carrier (Rainbow) for the transportation service of delivering cargo or goods to the point of destination. *See* Black's Law Dictionary, at 599 (West, 5th Ed.1979) ("Freight. The price or compensation paid for the transportation of goods by a carrier"). This term is further defined, in detail, *infra,* at p. 183.

In any situation whether existing or anticipated before commencement of or during the voyage including strikes and work stoppages, which in the Carrier's judgment may give rise to risk of damage delay or disadvantage to the vessel, her cargo or persons aboard, or make it imprudent to begin to continue the voyage or to enter or discharge at any port or to give rise to delay or difficulty in arriving or discharging or leaving any port or place or in making due disposition or delivery of the goods, the Carrier may decline to receive, keep or load the goods or may discharge the goods into any depot, craft or place or may proceed or return directly or indirectly to such other port or place as the Carrier may select and discharge the goods or any part thereof there, *may retain the goods on board until the return trip or such time as the carrier thinks advisable* or may forward or transship the goods by any means, *but always at the risk and expense of the goods* or may require the shipper or consignee to take delivery at port of shipment or elsewhere and if he fails to do so, *the Carrier may warehouse, store, sell or hold the goods.*

(Exhibit P–3) (emphasis added).

Clause 5(e) found in the Rainbow bill of lading states:

For extra services rendered pursuant to this clause, the Carrier shall be entitled to reasonable extra compensation.

(Exhibit P–3).

Clause 4(b) of the Rainbow bill of lading, also at issue in this case, states:

The Carrier shall deliver the goods at the port of discharge named herein or as near thereto as the vessel may safely get, lie and leave always afloat under all conditions of tide water and weather. *Should the vessel be unable for any reason to so discharge it may effect*

*delivery by any means and all extra time and expense shall be at the expense of the goods.*

(Exhibit P–3) (emphasis added).

## II. *Occurrences Prior to Sailing*

Beginning on September 4, 1984, Rainbow accepted bookings from the government for items of cargo for carriage on voyage 7E/B of the Rainbow Hope (Exhibit P–4, P–51, Tr. 138). From September 4, 1984, the government continued to routinely book cargo with the Rainbow Hope so long as Rainbow continued to accept bookings. The voyage for this cargo was originally scheduled to sail on September 24, 1984. However, both plaintiff and defendant learned of an impending or anticipated strike in Iceland prior to the subject sailing. Plaintiff learned of the possibility of the strike around September 24, 1984, from its agent in Iceland, Gunnar Gudjosson, Inc. (Tr. 83, 93, 137). On September 26, 1984, Captain Ott, supply officer for the Naval Station, Keflavik, Iceland, advised the government that there was a threat of a general strike against the Icelandic Government by civil service employees scheduled to begin October 4, 1984. This strike would cause the closure of ocean freight operations. (Stipulated fact 26).[5]

On September 24, 1984, Mr. Dennis Ryan, Manager of Sales Traffic for Rainbow, informed Mr. Howard of NAVSUP, that, due to the impending strike, the Rainbow Hope would not set sail until September 28, 1984. Rainbow accepted bookings after it learned of the anticipated strike and the last of the government cargo was booked on September 25, 1984. The cargo was loaded on the Rainbow Hope on September 28, 1984. There was no change in the status of the impending strike between September 24, 1984 (the originally sched-

5. On September 26, 1984, in response to the information concerning the strike, government officials conversed about the preparation of waivers for exemptions for the handling of DOD cargo for submission to the Icelandic Defense Council (Stipulated fact 25). If granted, these waivers would have allowed the carriers to discharge their cargo despite the strike. However, there was no evidence introduced at trial that the government represented that a waiver could be obtained for Rainbow's cargo. The mechanics of obtaining a waiver were not addressed and Rainbow did not introduce any evidence that it expected that a waiver would be sought on its behalf. Indeed, it appears that no waivers were obtained as approximately twenty-one vessels were strikebound in Iceland at that time. (Stipulated fact 59).

uled departure date) and September 28, 1984 (the date on which the vessel actually set sail). (Tr. 98). The government never gave Rainbow any instruction to sail or not to sail. Rainbow was aware of the possibility of the strike and the risk of delay likely to be encountered in discharging cargo at Njardvik, Iceland, prior to sailing on September 28, 1984 (Exhibit 13, Tr. 39, 43, 51, 133).

Had Rainbow discontinued vessel operations, the government would have transferred the cargo to Icelandic carriers. Indeed, following the Rainbow Hope's departure, the government shipped cargo to Iceland on Icelandic flag vessels, despite the possibility of the strike in Iceland (Stipulated fact 33).

### III. *Strike Declared in Iceland*

On October 4, 1984, the Federation of Government and Municipal Workers of Iceland commenced a general strike, which included all longshoreman at all discharge ports in Iceland (Stipulated fact 34). The strike was not directed at, nor in any way involved, any U.S. government entity (Tr. 142, 441).

The Rainbow Hope arrived at Njardvik on October 8, 1984, but was unable to discharge cargo as a result of the strike and thereafter anchored in the outer harbor (Stipulated facts 36–37). By October 29, 1984, approximately twenty-one vessels were strikebound in Iceland (Stipulated fact 59). On or about October 10, 1984, plaintiff, through its agent American Ship Management, Inc., telexed defendant requesting instructions as to whether the vessel should wait at anchor or proceed to an alternate point of discharge (Stipulated fact 40). Defendant refused to give instructions to plaintiff, but rather, defendant informed Rainbow that instructions were not appropriate, since Rainbow was a common carrier and its cargo was shipped via common carriage. In this telex, the government also advised Rainbow that freight is not earned until delivery at the specified port of discharge (Stipulated fact 45). The government further stated that, since Rainbow knew of the strike and set

sail with knowledge thereof, Rainbow took a calculated risk that the strike would be resolved by the time the ship arrived. In addition, the government told Rainbow that it did not agree that they were entitled to extra compensation for "taking appropriate action in the absence of instructions from the government" (Exhibit P–6).

The government did not give instructions to Rainbow at any point in time relevant to this litigation (Tr. 198). Numerous further attempts to obtain instructions from the government were to no avail. All further correspondence to defendant remained unanswered. However, J.P. Love, President of American Ship Management, (Rainbow's agent), was not surprised that the government did not respond to Rainbow's telexes requesting instructions. Although he was not surprised, he nevertheless continued to renew requests for instructions which the government declined to give.

■ It is clear that the government declined to give instructions, because it was not obligated to do so and it feared that it could incur liability for services performed by Rainbow in response to such instructions. Neither the government bill of lading nor the Rainbow bill of lading places any obligation on the government to instruct the carrier as to the disposition of its cargo, other than in accordance with the contracted for transaction. Under a common carriage system, as was offered by Rainbow here, the customer is not in a position to control or direct the ship. Rather, once the carrier accepts the cargo, it is responsible for directing the ship until delivery is made (Tr. 601–602).

■ Moreover, the evidence at trial demonstrated that there is a prevailing policy amongst shippers to abstain from giving instructions to common carriers (Tr. 605). Captain Ott supported this policy with his testimony (Tr. 449–52), and a Rainbow witness, Mr. Yonge, alluded to it as well. In particular, Mr. Yonge, president of Rainbow, testified "[i]t would not be the function of the Navy to give us instructions to sail, because we were operating a liner service on a predetermined schedule...." (Tr. 365–366). Plaintiff's expert, Mr. Hallo-

ran, also testified concerning such instructions, stating:

Q. Are you aware of any requirement under the Bill of Lading or any other document that requires the—a shipper to give a carrier instructions as to whether to deviate to not deviate, to go anchor, whatever?

A. Strict answer is no.

(Tr. 582).

In addition, Mr. Halloran testified that it is the carrier's responsibility to determine what will be done with the cargo:

The carrier has formulated as a rule a game plan vis-a-vis that cargo as to what he is going to do if he cannot, in fact, avoid sailing into the face of a strike. He advises the shipper, shippers, that they accept it. Frankly, there isn't much they can do. They have to go by the decision of the carrier.

(Tr. 572).

Therefore, it is clear that, according to the terms of the bills of lading and standard policy amongst shippers and carriers, the government was under no obligation to instruct Rainbow concerning the disposition of the cargo in light of the strike. Rather, the carrier, Rainbow, was required to decide how to handle the cargo. On October 12, 1984, Rainbow carried out this obligation and informed the government that the vessel would remain anchored pending termination of the strike, unless it received instructions from defendant regarding an alternate port of discharge (Tr. 316—317). No instructions were ever given, and the Rainbow Hope remained at anchor until the strike ended.

The strike ended on October 30, 1984 (Exhibit P–20). On October 31, 1984, the Rainbow Hope discharged its cargo and voyage 7E/B was completed (Stipulated fact 61). All freight earned by plaintiff regarding Voyage 7E/B has been paid by the government. (Stipulated fact 62). In particular, the government paid Rainbow

$266,370.50 in freight charges. (Exhibit P–1).

By letter dated October 21, 1985, Rainbow submitted a claim to defendant for lost freight revenues in the amount of $586,024.45 and out of pocket expenses in the amount of $290,599.11 for operating the Rainbow Hope during the period of the strike (Stipulated fact 63).

## CONCLUSIONS OF LAW

■ The Suits in Admiralty Act allows a commercial carrier to recover damages incurred as a result of liability on the part of the United States government. Plaintiff's cause of action is composed of two distinct elements. First, plaintiff must establish liability on the part of the United States government, and second, if liability is established, plaintiff must prove the damages, if any, that were proximately caused by the strike and that these damages serve as reasonable compensation for its loss.

### I. *Establishing Liability*

Plaintiff advances the position that its conduct was reasonable under the circumstances and that, as a result, it is free to take advantage of the exculpatory provisions in the bill of lading. Plaintiff further asserts that the liberties and "extra services" clauses of the Rainbow bill of lading permit recovery of reasonable compensation for costs it incurred as a result of the strike. Rainbow argues that by holding the goods on board the anchored ship, it performed "extra services" entitling it to extra compensation.[6]

On the other hand, defendant, the United States government, contends that the liberties clause found in the bill of lading is rendered inoperative by plaintiff's unreasonable decision to sail to Iceland on September 28, 1984. The government also argues that the liberties and "extra services" clauses do not grant Rainbow the right to the compensation it seeks, because Rainbow did not provide "extra services." The

---

**6.** Plaintiff's claims rest entirely upon the bill of lading. No claims have been made of commercial impracticability, unjust enrichment or the like. *Compare American Foreign S.S. Corp. v.*

*9,000 Tons of Manganese Ore,* 109 F.Supp. 765, 770 (D.N.J.1952) (if the carrier is entitled to recover "additional freight," it must do so on a quantum meruit basis).

government argues that the costs incurred by Rainbow were simply an element of its freight charges; it claims Rainbow is, in essence, seeking additional freight charges to which it is not entitled because plaintiff has been paid all freight due under the contract.

■ At the outset, the issue of the reasonableness of plaintiff's conduct must be addressed. The courts uniformly apply a rule of reasonableness in determining whether a carrier is afforded protection under the exculpatory provisions of a bill of lading. "Failure to exercise reasoned judgment will oust the contract of carriage." *Mare Schiffahrtskontor v. M/V Oceanhaven,* 763 F.2d 633, 637 (4th Cir. 1985). "The carrier must exercise reasonable judgment under the circumstances existing and reasonably foreseeable at the time the judgment is made." *Orient Mid–East Lines, Ltd. v. Cooperation for A.R.E., Inc.,* 284 F.Supp. 34, 43 (D.D.C. 1968), *aff'd,* 410 F.2d 1006 (D.C.Cir.1969); *Surrendra Private Ltd. v. S.S. Hellenic Hero,* 213 F.Supp. 97, 101 (S.D.N.Y.1963), *aff'd,* 324 F.2d 955 (2d Cir.1963). "What the shipper had the right to demand of the carrier was, not infallibility, but the exercise of a reasoned judgment of the situation as it appeared at the moment, having regard to the rights of all concerned." *Orient Mid–East Lines,* 284 F.Supp. at 44 (emphasis omitted) (citing *The Styria v. Morgan,* 186 U.S. 1, 9–10, 22 S.Ct. 731, 734-35, 46 L.Ed. 1027 (1902)); *The Wildwood v. Amtorg Trading Corp.,* 133 F.2d 765, 767 (9th Cir.1943), *cert. denied,* 319 U.S. 771, 63 S.Ct. 1436, 87 L.Ed. 1719 (1943); *see also Surrendra,* 213 F.Supp. at 101 (protection afforded under the liberties clause only if carrier acted reasonably under all the circumstances).

In light of this precedent, I must first decide whether Rainbow acted reasonably, under all the circumstances, in setting sail for Iceland on September 28, 1984 and in remaining at anchor. If not, Rainbow is not entitled to any recovery. *See Mare, supra,* at 637–38. However, if Rainbow did act reasonably, I must then determine whether the liberties clause applies to permit plaintiff to recover against defendant and further, whether the services performed by Rainbow were "freight" services or "extra services" entitling Rainbow to extra compensation under clause 5(e) of the bill of lading. If these queries are answered in the negative, I must then decide whether Rainbow may recover under clause 4(b) of Rainbow's bill of lading.

### A. *Reasonableness of Rainbow's Conduct*

### (i) Decision to Sail

■ In order to decide this first issue, (whether the decision to sail was reasonable), I must look at all the facts available at the time of departure. "The issue of 'unreasoned judgment' requires a factual determination subject to review on a 'clearly erroneous' basis." *Mare Schiffahrtskontor, supra,* at 637.

■ Both Rainbow and the government were aware of the possibility of the strike in Iceland (Tr. 43, 86, 91, 359, 439—444). However, the decision to sail was managerial in nature and was solely that of the management of Rainbow. The decision was in no way influenced by the government (Tr. 364—365). As stated earlier, the government was under no obligation to instruct the Rainbow Hope whether to sail or not to sail. Nor did the government's continued bookings of cargo serve as instructions to Rainbow, either explicitly or implicitly (Tr. 366). The record clearly establishes that Rainbow's decision was based on custom in the maritime industry, the unpredictable nature of strikes, and information received from their agent in Iceland.

■ The decision to sail was not an unusual one in the maritime industry in light of the fact that it is the business of the industry to sail. The President of Rainbow testified that based on his long experience in the maritime industry, "If we canceled a voyage every time we wanted to go to a port because there might be a potential for a strike or labor problem, you couldn't possibly be in business" (Tr. 358). He stated that "I've had ships I've sent all over the world, I've had rumors there might be a

strike and, you know, we still send our ships there. You have to." (Tr. 365). His testimony indicates that it is not customary to hold a ship in port based on the rumor of a strike (Tr. 366). In addition, Richard Halloran, plaintiff's expert testified that, in his experience at Sea–Land (another ocean carrier), he would not cancel a voyage due to the rumor of a strike [7] (Tr. 573—574). Captain Ott, a Navy supply officer, also testified, that, in his long experience in the maritime industry, he had no recollection of a liner service canceling a sailing because of a rumor or threat of a strike at the port of destination (Tr. 461).

In light of the above, plaintiff suggests that a decision should not be made based upon a rumor of a strike, because the unpredictable nature of strikes makes it virtually impossible to predict how long they will last, how much they will effect the industry, or if they will occur at all (Tr. 358, 368, 470).

Defendant does not dispute these contentions concerning the industry practice to sail in the face of a threatened strike. Nevertheless, defendant argues that the plaintiff behaved unreasonably in this instance, because there were no alternatives available to it upon reaching Iceland. In support of this view, defendant points to the testimony of plaintiff's expert regarding his experience at Sea–Land carriers; he stated that Sea–Land would sail despite a threatened strike *because* they had other options available for discharge of their cargo, whereas Rainbow did not (Tr. 574). Defendant also argues that plaintiff assumed the risk that it would be required to anchor outside the port, because plaintiff knew of the risk of a strike at the time of sailing but nevertheless continued to accept bookings and to sail.

After fully considering these competing contentions, I find that, in light of the facts known to plaintiff at the time of its decision to sail, its decision was reasonable. The facts regarding the nature of the strike cannot be viewed in retrospect. "The reasonableness of the carrier's ...

apprehension of the increased hazard is not determined by subsequent events." *The Wildwood*, 133 F.2d at 767; *see also The Styria, supra*, 186 U.S. at 22, 22 S.Ct. at 739 ("The master and the ship cannot reasonably be charged with knowledge of subsequent events"). Thus, the fact that this particular strike was severe, included the whole public sector of Iceland and media, and effectively paralyzed the country, is immaterial, because there was no evidence that Rainbow suspected such a severe strike at the time of its departure.

The evidence at trial showed that Rainbow primarily relied on information obtained from its agent Gunnar Gudjossen, Inc., in Iceland, regarding the possibility of and expected nature of the strike (Tr. 83, 84, 92), although plaintiff also was in contact with the State Department regarding the local situation in Iceland (Tr. 358). Mr. Gudjossen, Rainbow's agent, informed plaintiff that there was an impending civil service strike that would affect the longshoreman (thereby affecting the off-loading of cargo in Icelandic ports). However, the agent stated that he did not believe that the strike would last for more than a couple of days. Indeed, Captain Ott, a government representative, testified that the feeling in Iceland prior to the commencement of the strike was that it would not be lengthy (Tr. 443). This view comports with that passed on to plaintiff by its agent in Iceland. Rainbow also did not believe that the strike would affect the military cargoes (Tr. 93). Based on this information, plaintiff drew a reasonable conclusion that the strike would not pose a significant threat to the completion of voyage 7E/B.

In addition to plaintiff's conclusion concerning the severity of the strike, Rainbow had few, if any, alternatives available to it at the time it decided to sail. As I indicated above in my findings of fact, Rainbow's usual trade route in 1984 was in the U.S. east coast/Iceland trade. Thus, an alternative use for the Rainbow Hope (which would not entail confronting the

---

**7.** Plaintiff's expert qualified this testimony, however, by stating that Sea–Land had alternative ports available to it when faced with a strike (Tr. 573–574).

strike) was tenuous, at best. Moreover, another use could have interfered with Rainbow's ocean liner service if the strike ended before the additional contracted work was completed. (Tr. 371, 409, 410). Rainbow was not required to seek additional work and jeopardize its ocean liner scheduled service to satisfy a standard of reasonableness, especially due to the uncertain nature of strikes and the predictions that the strike in Iceland would be relatively short. (Tr. 93, 443).

This matter presents a rare occurrence where all ports in a geographic area were closed. Every port in Iceland was affected by the strike. The nearest open ports were located in the Azores and western Europe. Any alternative would have proven costly. However, as I stated above, Rainbow's decision cannot be scrutinized with the benefit of hindsight.

With regard to defendant's argument that plaintiff assumed the risk of the strike by continuing to accept bookings and then sailing, it is true that plaintiff took a business risk; however, this risk does not render its conduct unreasonable. Rainbow is entitled to invoke the liberties clause in its bill of lading, provided its conduct was reasonable, and provided the risk with which it was ultimately confronted was substantially greater than the risk it anticipated at the time of contracting. For instance, in *Surrendra, supra,* the court held that, "for a carrier properly to invoke its liberties clause, it has to be faced with a risk substantially greater than the risks anticipated at the time of contracting...." *U.S. v. Waterman S.S. Corp.,* 471 F.Supp. 87, 93 (D.D.C.1979) (citing *Surrendra,* 213 F.Supp. at 98–99). This principle was applied in *Waterman,* wherein the court concluded that "once Waterman actually knew or had to have known with certainty that Saigon would fall to the Communists in the immediate future, it could no longer sign bills of lading...." *Waterman,* 471 F.Supp. at 93; *see also Ross Indus. v. M/V Gretke Oldendorff,* 483 F.Supp. 195, 200 (E.D.Tex.1980) (holding that carrier could not invoke the liberties clause contained in its bill of lading, because carrier had reason to know of congestion at the time the bill of lading was issued and any increase in the congestion should have been anticipated).

In this case, Rainbow did not have knowledge of the impending strike at the time a substantial amount of the bookings were made. Bookings were made from September 4 through September 25, 1984, and Rainbow learned of the possibility of the strike on September 24, 1984. In addition, the risk escalated after the vessel embarked on voyage 7E/B. A rumor/threat existed at the time the last bill of lading was submitted. The strike ensued when the voyage was two-thirds complete. The risk that resulted was much greater than anticipated at the time of contracting, and therefore, in accordance with the principle set forth in *Surrendra,* the liberties clause is not rendered inapplicable by plaintiff's decision to sail.

Accordingly, in light of all the circumstances known to plaintiff at the time the decision to sail was made, plaintiff acted reasonably and has fulfilled the standard of reasonableness instituted by the courts. During trial other facts relating to the issue of reasonableness were introduced, such as the severity of the strike; however, these facts were unknown to plaintiff at the time of its decision and are therefore irrelevant to this discussion.

### (ii) Decision to Remain at Anchor

In a strike situation, ordinarily the appropriate thing for a vessel to do is to proceed to the nearest port and drop the goods there, or proceed to the next port of discharge (T. 182). It appears that, in light of the strike, Rainbow's tarriff or the Shipping Act would not have been violated had Rainbow deposited the cargo at another port outside the usual trade route (T. 306, 307, 317). Discharging at an alternative port would not have presented a problem, as the cargo was not perishable, and there was no immediate need for the cargo on the base (Tr. 95). Alternatives were available to Rainbow, but it decided not to take

advantage of them.[8]

Nevertheless, I find that Rainbow's decision to remain in Iceland and await the termination of the strike was reasonable. There were no ports in Iceland at which the plaintiff could discharge its cargo, but rather, in order to discharge, it would have been necessary for the ship to sail to the Azores, Western Europe, or back to Norfolk. Moreover, the government does not contest this issue. "We believe that once the vessel got to Iceland, that probably it was reasonable for them to stay there. We didn't dispute the action they took once they got there" (Tr. 38).

### B. *Applicability of the Liberties Clause*

Having found that Rainbow acted reasonably, the next inquiry I must make is whether the liberties clause of the bill of lading (clause 5(a)), provides plaintiff with a right of compensation in the matter at hand.

 As I set forth in my findings of fact, both the government bill of lading and Rainbow's bill of lading constitute the contract in this matter. In accordance with traditional maritime law and the CFR, the government bill of lading incorporates the carriers' usual contract of carriage. However, shipments are made subject to such terms except as provided by regulation or otherwise provided for in the government bill of lading. In particular, the regulations provide that

The GBL is subject to the same rules and conditions as govern shipments made on the usual commercial forms *unless otherwise specifically provided or stated herein.*

*See* 41 CFR § 101–41.302–3(a)(4) (emphasis added). *See also Alcoa Steamship v. United States*, 338 U.S. 421, 422, 70 S.Ct. 190, 191, 94 L.Ed. 225 (1949); *In the Matter of Delta Steamship Lines*, 58 Comp. Gen. 799 (Sept. 26, 1979). This regulation deems the government bill of lading controlling where there is a conflict, and where there is no conflict, the Rainbow bill of lading controls.

In this case, there is nothing in the government bill of lading or the Code of Federal Regulations that *specifically* negates the liberties clause in the Rainbow bill of lading, unless Rainbow seeks compensation in the nature of additional freight.[9] Thus, I find that the controlling clause in this case is the liberties clause of the Rainbow (commercial) bill of lading, unless Rainbow claims compensation in the nature of additional freight, in which case the government bill of lading controls. (Tr. 318, 419).

 The liberties clause [10] expressly refers to anticipated strikes, but it does not specifically delineate the parties' rights and obligations in a situation where, as here, the carrier stores the goods on board the vessel prior to delivery at the designated port.[11] More particularly, Clause 5(a) pro-

---

**8.** In comparison, there is some question as to what happened to the Icelandic flag vessels which carried U.S. cargo at that time. It appears that the Icelandic carriers made a business decision to deposit the cargo in another port, unlike Rainbow who decided to remain in Iceland (Tr. 454, 614). Plaintiff alleges that the government gave instructions to these carriers. However, there is no basis in the record for this allegation.

**9.** The government is prohibited from paying any amount in excess of the value of the services rendered. *See Delta Steamship Lines,* 58 Comp.Gen. at 800–801. The carrier is prohibited from "charging, demanding, collecting or receiving a greater or lessor or different compensation for transportation or any transportation service than is set forth in the published and filed tariff except as authorized by the Fed-

eral Maritime Commission under specified circumstances." *See id.* at 800; *see also* 46 U.S.C. § 817. In addition, the CFR provides that shipments must be made "at the restricted or limited valuation specified in the tariff ...." 41 CFR § 101–41.302–3(e). Under the CFR, the government is prohibited from paying claims reflecting pricing adjustments for services previously billed and paid. *See* 41 CFR 101–604–2(4). Thus, to the extent Rainbow seeks compensation in the nature of additional freight, a conflict exists and the government bill of lading controls.

**10.** The applicability of Clause 4(b) is discussed *infra,* at p. 188.

**11.** According to maritime law, a bill of lading is interpreted as a contract of adhesion. There must be strict adherence to the bare words of

vides that, in the event of an anticipated or actual strike, where in the judgment of the carrier it is imprudent to continue the voyage or discharge the goods, then (1) the carrier may decline to receive, keep or load the goods; (2) the carrier may discharge the goods into any depot, craft or place; (3) the carrier may proceed or return directly or indirectly to such *other* port or place as the carrier may select and discharge the goods or any part thereof there; (4) *the carrier may retain the goods on board until the return trip or such time as the carrier thinks advisable;* (5) the carrier may *forward* the goods by any means, but always at the risk and expense of the goods; or (6) the carrier may require the shipper or consignee to take delivery at the port of shipment or elsewhere and *if he fails to do so,* the Carrier may warehouse, store, sell or hold the goods. *See* Clause 5(a), Rainbow Bill of Lading, *supra,* at 175. The clause further states that, "[f]or extra services rendered pursuant to this clause, the carrier shall be entitled to reasonable extra compensation." *See, Id.* A fair reading of this clause compels the conclusion that, if any of the subparts to this clause applies to entitle Rainbow to extra compensation for "extra services," it is the portion of the clause which entitles Rainbow to retain the goods on board until the carrier thinks advisable.[12]

■ Thus, the question I must resolve is whether, under the terms of this contract, Rainbow's retention of the goods on board prior to discharge was an "extra service" entitling Rainbow to extra compensation. Defendant argues that plaintiff has not performed any "extra services," but rather, it has merely performed freight services. The government complains that

it has paid its freight charges in the amount of $266,370.50 and that Rainbow is not entitled to the additional "freight" which it is currently demanding.

In resolving this question, I am guided by the definition of the word "freight," general rules of contractual construction, as well other cases wherein similar clauses have been interpreted.

### (i) Definition of the Word Freight

■ The parties agree that "freight" is the money paid by a shipper to a carrier for carrying cargo or goods. (Tr. at 238). "Freight" is not earned until the cargo is delivered at the destination specified in the bill of lading; the obligation to carry and care for the goods remains on the carrier until the goods are actually delivered. *Alcoa, supra,* 338 U.S. at 422, 70 S.Ct. at 191 ("It is a principle of American maritime law that ocean carrier freight charges are not earned unless and until the goods are delivered to destination") (footnote omitted). *See also* Schoenbaum, *supra,* § 9–2 at 279 ("a shipper is not liable for freight for carriage of goods until the goods have been delivered to the final agreed destination").

Goods are not "actually delivered" and freight is not earned until the goods are discharged at the port of discharge, meaning delivered at shore or alongside the vessel. *See, e.g., Greenstone Shipping Co. v. Transworld Oil, Ltd.,* 588 F.Supp. 574, 579–580 (D.Del.1984) ("[i]f the goods are not taken delivery of by the receiver from alongside the vessel without delay, or if the receiver refuses to take delivery, ... the carrier shall be at liberty to land such goods on shore or at any other places at the sole risk and expense of the shipper").

the contract, (*see Alcoa v. United States,* 338 U.S. 421, 422, 70 S.Ct. 190, 191, 94 L.Ed. 225 (1949)), and any ambiguities must be resolved against Rainbow, the drafter. *The Caledonia,* 157 U.S. 124, 137, 15 S.Ct. 537, 543, 39 L.Ed. 644 (1895) ("as the exceptions were introduced by the [carrier] ... they are to be construed most strongly against them"). *See also Mitsui v. Am. Export Lines, Inc.,* 636 F.2d 807, 822–23 (2d Cir.1981) ("ocean bills of lading are contracts of adhesion ambiguities in which must be resolved against the carrier"); *Associated Metals & Min-*

*erals v. M/V Vishva Shobha,* 530 F.2d 714, 715 (6th Cir.1976) ("The ambiguity of the liberties clauses would have to be construed against the carrier, who drafted them"); *U.S. v. Strickland Trans. Co.,* 200 F.2d 234, 235 (5th Cir.1952), and *Schoenbaum, supra,* § 9–8 at 298–290.

12. The aspect of the clause numbered six, above, does not apply, because the facts are clear that the government never refused delivery; rather, the strike made it impossible for Rainbow to tender delivery at the port of discharge. *See supra,* note 11 at p. 182.

In addition, under the Carriage of Goods by Sea Act, (COGSA), 46 U.S.C.App. § 1300 *et seq.*,—which applies to bills of lading as provided for under 46 U.S.C.App. § 1300 [13]—the carrier has the obligation to properly and carefully load, handle, stow, carry, keep, care for and discharge the goods during "carriage." *See* 46 U.S.C. App. § 1303. " '[C]arriage of goods' covers the period from the time when the goods are loaded on to [the ship until] the time when they are discharged from the ship." 46 U.S.C.App. § 1301(e). Thus, once the shipper releases the cargo to the carrier, the carrier is responsible and bears the risk of delivering the cargo to its destination. (Tr. 602).

■ Therefore, "freight" encompasses all services rendered by the carrier in transporting the goods to the port of discharge. By definition, the services performed by plaintiff in holding the goods on board prior to discharge constituted an element of "freight" and not "extra services." Since Rainbow already had the obligation to stow and care for the goods, it has failed to show that by stowing and caring for the cargo it has provided any "extra services" apart from freight to merit extra compensation. Rather, Rainbow has merely performed its contract as required. At the time of the strike, the vessel was still in the process of carriage of goods under 46 U.S.C.App. § 1301(e), as it had yet to deliver the cargo.

While plaintiff complied with the terms of the bill of lading by delivering the cargo to the port of destination—thereby earning the freight for Voyage 7E/B—the acts of The Rainbow Hope from October 8–30, 1984 are attributed to the earning of the freight. Rainbow contracted to transport goods from the United States to Iceland, for a certain freight, earned upon delivery of the cargo in Iceland. The unanticipated costs incurred are at the risk of the carrier

and unrecoverable, as they were suffered as a result of earning the original freight. Accordingly, based upon the generally accepted meaning of the word "freight", plaintiff is not entitled to any additional compensation.

(ii) General Rules of Contractual Interpretation

■ General principles of contract construction also support a judgment for defendant. It is a general principle of contract law that the purpose of an agreement should be considered in construing its terms. *See Seal Tite Corp. v. Ehret, Inc.,* 589 F.Supp. 701, 705 (D.N.J.1984). The purpose of a liberties clause has traditionally been to relieve the *carrier* of liability for delay and damages to goods resulting from deviations, strikes and the like. At common law, a common carrier was regarded as an insurer of the goods and would, within narrow exceptions, be liable for any damage thereto. *See, Orient Mid–East Lines, supra,* at 42; Schoenbaum, *supra,* § 9–6 at 293.[14] In addition, a *carrier could be liable to the shipper* for losses resulting from a delay in delivery. *See Atlantic Mut. Ins. Co. v. Poseidon Schiffahrt,* 313 F.2d 872, 875 (7th Cir.1963), *cert. denied,* 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963) (where the carrier causes a delay in the transport of goods to the port of discharge, it is liable to the shipper for damages in the amount of the difference in the market value of the goods at the time and place that they should have arrived and their market value on actual delivery); *see also B.F. McKernin & Co., Inc. v. U.S. Lines, Inc.,* 416 F.Supp. 1068, 1070–72 (S.D.N.Y.1976) (holding carrier not liable for delay damages resulting from a one month delay, because the shipper recovered the entire price of the goods). In addition, a carrier was held strictly to the route set forth in the contract of carriage, and (at

---

**13.** Every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade, shall have effect subject to the provisions of this chapter. 46 U.S.C.App. § 1300. "Goods" are defined under COGSA to include "wares, merchandise and arti-

cles of every kind whatsoever ..." 46 U.S.C. App. § 1301(c).

**14.** Now, the duties of a common carrier are primarily governed COGSA. *See EM Chemicals v. S.S. Sloman Najade,* 670 F.Supp. 87, 89 (S.D.N.Y.1987).

common law), it could forfeit its right to freight should there be an unreasonable deviation from the designated route. *See, e.g., Hellenic Lines, Ltd. v. Embassy of Pakistan,* 467 F.2d 1150, 1206–07 (2d Cir. 1972); *Associated Metals & Mineral v. M/V Vishva Shobha,* 530 F.2d 714, 715, 719 (6th Cir.1975).

Because of the heavy obligations imposed upon carriers, traditionally liberties clauses have been applied to grant carriers the "liberty" of travelling over alternate routes, without risk of liability or forfeiture, where uncontrollable and/or unforeseen difficulties arise:

> Because an unjustifiable deviation so greatly expands an ocean carrier's liability, it has become customary for carriers to insert in their bills of lading very broad liberty clauses purporting *to authorize* various departures from the direct customary route and various modifications of the carriage contract. While Courts were originally inclined to construe these clauses strictly against the carrier, in recent years they have been interpreted more favorable to the carrier, construed *to authorize* reasonable departures from the normal route.

Benedict, ADMIRALTY & MARITIME LAW, Volume 2A, § 125 at 12–17 (emphasis added). *See also Orient Mid–East Lines, supra,* at 42 ("Because of the harsh consequences of this rule of absolute liability carriers began inserting exceptive or exculpatory clauses into bills of lading"). Indeed, in *J.M. Rodriguez & Co., Inc. v. Moore–McCormack L., Inc.,* 32 N.Y.2d 425, 345 N.Y.S.2d 993, 299 N.E.2d 243 (1973), the court described the general effect of a standard liberties clause as follows:

> Its effect where there is a strike preventing unloading when the ship arrives in port is to suspend the duty of the carrier to deliver the goods and, in a proper case where the delay is the proximate cause, to relieve the carrier of liability for deterioration during the period of delay.

*Id.,* 345 N.Y.S.2d at 996, 299 N.E.2d at 245.

Since the primary purpose of the liberties clause, as recognized in the cases and other authorities, is to relieve the carrier of liability, the word "extra services" should not be liberally construed to encompass freight charges in order to provide the carrier with an independent cause of action for damages.[15] Indeed, while the carrier should not be liable to the shipper for delay damages caused by events wholly beyond its control, (such as a strike), it does not reasonably follow that the entire cost of the carrier's operations resulting from the strike should be imposed upon the shipper who has is in no way occasioned the strike. Rather, this risk should be allocated to the party best able to minimize the costs associated therewith, through insurance or otherwise. *See Argonaut Ins. Co. v. Town of Cloverdale Ind.,* 699 F.2d 417, 420 (7th Cir.1983). Here, the carrier is in a much better position to minimize the costs of operating its ship upon the occurrence of a strike, as the shipper has no authority to control or manage the ship.

Thus, neither the definition of the word "freight" nor general rules of contractual construction supports plaintiff's position that it performed "extra services" by retaining the cargo on board prior to delivery.

(iii) Relevant caselaw

In light of the above discussion, there is, understandably, a sparsity of caselaw in which carriers have successfully invoked liberties clauses in support of a right to damages. In *American Trading & Prod. Corp. v. Shell Int'l Maritime Ltd.,* 453 F.2d 939 (2d Cir.1972), the carrier attempted to invoke its liberties clause to obtain extra compensation for costs incurred while taking an alternate route around Cape Horn due to the closing of the Suez Canal. The pertinent language of the liberties clause in *American Trading* was substantially similar to that in the instant case. In particular, the bill of lading in *American Trading* provided, in part, that

> [i]n any situation whatsoever and wheresoever occurring and whether existing or

---

15. *See also* note 11, *supra,* at pp. 182–83.

anticipated before commencement of or during the voyage, which in the judgment of the Owner or Master is likely to give rise to risk of capture, seizure, detention, damage, delay or disadvantage to or loss of the Vessel or any part of her cargo, ... the Vessel may proceed or return, directly or indirectly, to or stop at any such port or place whatsoever as the Master or the Owner may consider safe or advisable under the circumstances, and discharge the cargo, or any part thereof, at any such port or place; *or the Owner or the Master may retain the cargo on board until the return trip or until such time as the Owner or the Master thinks advisable* and discharge the cargo at any place whatsoever as herein provided or the Owner or the Master may discharge and forward the cargo by any means at the risk and expense of the cargo. The Owner may, when practicable, have the Vessel call and discharge the cargo at another or substitute port declared or requested by the Charterer.... *For any service rendered to the cargo as herein provided the Owner shall be entitled to a reasonable extra compensation.*

*American Trading,* 453 F.2d at 943 n. 6 (emphasis added).

In *American Trading,* the carrier was warned that there had been trouble in the Suez Canal and that there was a possibility of its closure. The vessel continued its voyage toward the Canal and while en route, the Canal was closed due to a state of war in the Middle East. The carrier was then instructed, by the owner, to take the alternate route around Cape Horn. Plaintiff, the carrier, sought extra compensation for the additional time and mileage spent on the alternate route, but its claims were denied. The Second Circuit held that plaintiff was not entitled to extra compensation, finding the liberties clause inapplicable:

We construe it [the liberties clause] to apply only where the master, by reasons of dangerous conditions, deposits the cargo at some port or have other than the designated place of discharge. Here the cargo did reach the designated port al-

beit by another route, and hence the clause is not applicable.

*Id.* at 944.

The Second Circuit reached this conclusion, even though the bill of lading at issue provided that the carrier "may retain the goods on board until the return trip or such time as the carrier thinks advisable," and even though the bill of lading provided the Carrier with a right to extra compensation for extra services performed pursuant to that clause. *Accord Colonial-grossisternes Forening v. Moore–McCormack Lines,* 178 F.2d 288, 290 (2d Cir.1949) (holding that a discharge of the goods *not at the port of destination* but at the port of origin was an extra service, although no mention was made of storage services as a basis for additional compensation).

Likewise, in *Delta Steamship Lines, supra,* a vessel carrying government cargo sustained severe machinery damage. As a result, the voyage had to be abandoned and the cargo was transshipped by another vessel belonging to the carrier *to its designated destination.* The carrier claimed that it was entitled to a second freight in light of the transhipment. The court held that "[s]ince under the government bill of lading freight is at the risk of the vessel there is no entitlement to a second freight or transhipment cost, which is dependent upon the freight having been earned *at the alternate delivery.*" *Delta Steamship Lines,* 58 Comp. Gen. at 801 (emphasis added).

Similarly, in *Costa Line Cargo Serv. v. McGraw–Edison Co.,* 623 F.Supp. 51 (D.C. N.Y.1985), the court held that the carrier was not entitled to extra compensation from the shipper for detention and diversion charges that were incurred when it was necessary for the carrier to deviate from its regular route in accordance with directions from the Iraq Customs Authority. *Id.* at 53, 54, 55. The court relied upon the plaintiff's status and obligations as a common carrier:

plaintiff, as a common carrier by water, was required to file its tariffs with the Federal Maritime Commission, to keep such tariffs open for public inspection

showing all its rates and charges, and to adhere to the rates, charges, and services as set forth in its tariffs. Any rules or regulations which may affect or vary the rates that tariffs disclose must be set out. The carrier cannot charge a greater or lesser rate for its services than the tariffs require.

*Id.* at 53–54.

The court recognized that plaintiff had published its "through rates" for the shipping of the goods and it held that surcharges could not be exacted, because "the tariff makes no mention of detention or deviation charges." *Id.* at 54. Likewise, the terms and conditions of the freight carriage in the instant case are governed by the U.S. Government bills of lading and Rainbow tariff No. 1, as duly filed with the Federal Maritime Commission. (Stipulated fact no. 18). There is no evidence that detention charges are listed in Rainbow's tariff. Rainbow was paid its freight by the government and it cannot now demand additional freight which was not set forth in its tariff.[16]

In contrast, it appears that the only reported case awarding compensation to the carrier for storage and related costs prior to the discharge of the goods at the port of delivery is *Ataei v. M/V Barber Tonsberg*, 639 F.Supp. 993 (S.D.N.Y.1986). However, *Ataei* is factually dissimilar to the present case. In *Ataei*, the goods were initially scheduled to be transported from Bahrain to Los Angeles. However, it was alleged that the goods were stolen and the carrier was advised by the Criminal Investigation Directorate (CID) that the container was connected to a criminal case and was to be off-loaded at the nearest port. *Id.* at 996–97. The carrier acted accordingly by discharging the goods in Yokohoma, Japan, and providing storage, insurance, and other services to the cargo while litigation ensued regarding whether the goods had been paid for. *Id.* at 997. Eventually, Mr. Ataei was ordered by a Bahraini Court to pay for the goods and they were then delivered to defendant, Mr. Ataei's mother. *Id.* Thereafter, the carrier presented a bill for the storage and related services to defendant. The court allowed recovery noting that when the goods were discharged and stored in Japan, the carrier was not on its voyage and had no intention of arranging to move the goods to the port of discharge. *Id.* at 999 n. 3.[17]

In the present matter, the carrier did not receive any instructions from the government and the voyage was never abandoned nor previously completed. Rainbow was still in the process of carriage of the goods during the time for which damages are claimed. The goods were not discharged at a destination other than the port of delivery. In addition, Rainbow had every intention of delivering the cargo to its destination at the time its ship was strikebound.

---

**16.** I recognize that in *Costa Line*, the court also discussed the applicability of a bill of lading which allowed for the discharge of goods *other than at the port of discharge* due to detention, damage, delay to disadvantage, etc. The court seemed to indicate that such a clause may permit reasonable compensation for such charges incurred during the ocean voyage, because it specifically stated that "all expenses and charges so incurred shall be payable by the owner or consignee thereof...." *Id.* at 55. However, even if such a bill of lading existed in this case, it would not be applicable, because Rainbow did not discharge the goods at a port other than the port of discharge designated in the contract. *Compare American Trading*, discussed *supra*. Moreover, the bill of lading in this case does not state that it is the shipper's obligation to pay for "all expenses and charges so incurred", but rather, the Rainbow bill of lading only permits compensation for "extra services." Any ambiguity created by the use of this word must be construed against Rainbow. *See supra*, note 10, at p. 182. Moreover, as discussed above and as recognized by the court in *Costa Line*, the costs incurred by Rainbow in completing its voyage and fully delivering the goods from dock to dock cannot be characterized as "extra services." These services are the freight carriage services which the government contracted for in the first instance and for which the government paid when it tendered Rainbow its freight in the amount of more than $266,000.00. Rainbow is not entitled to additional freight. *See supra*, note 9, at p. 182.

**17.** Notably, the compensation awarded covered only storage, warehousing, and insurance costs actually incurred while the goods were being stored at the alternate port. 639 F.Supp. at 997. No compensation was awarded for such things as overhead, lost demurrage, or costs incurred while returning the goods to Japan.

These facts clearly distinguish the present matter from *Ataei*—the only reported case awarding compensation for storage and related costs. Accordingly, the relevant caselaw does not support the plaintiff's position that it performed "extra services" by retaining the cargo on board prior to delivery, but rather, it most persuasively supports a judgment for defendant.

In sum, the government has strenuously argued that Rainbow did not perform extra services by retaining the goods on board prior to discharging them at the port of delivery. The government contends that these "services" were an element of freight and that Rainbow is not entitled to additional freight. Rainbow, which drafted the contract and against whom all ambiguities must be resolved, claims the services it provided were not freight services. However, the commonly understood meaning of the word freight, general rules of contractual construction, and all the relevant caselaw supports the government's position. Based on the foregoing, I find that the services performed by Rainbow are not "extra services" entitling it to additional compensation. Accordingly, I find that judgment should be rendered in favor of defendant as to Rainbow's claims under Clause 5 of the Rainbow bill of lading.

### C. *Liability under Clause 4(b) of the Bill of Lading*

Having found that Rainbow is not entitled to compensation under Clause 5 of the bill of lading, I must consider whether Clause 4(b) applies. The government argues that this Clause does not apply under the Ejusdem Generis rule.

■ The statutory maxim of ejusdem generis [18] limits general terms which follow specific terms, to matters that are similarly specified. The maxim can also be employed in the converse. *United States v. LeBrecque*, 419 F.Supp. 430, 434 (D.C.N.J.

1976). "This maxim of statutory analysis counsels courts to construe the broad in light of the narrow, in a commonsense recognition that general and specific words, when present together, are associated with and take color from each other." *United States v. Insco*, 496 F.2d 204, 206 (5th Cir.1974). Ejusdem generis serves as "an instrumentality for ascertaining the correct meaning of words when there is uncertainty. Ordinarily, it limits general terms which follow specific ones to matters similar to those specified." *United States v. Powell*, 423 U.S. 87, 91, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975) (quoting *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936)).

■ Relief has not been granted under clause 5(a). Clause 5(a) relates to the specific situations of strikes and work stoppages which may prohibit the vessel from discharging its cargo. Clause 4(b) provides for *any* situation where the vessel cannot discharge its cargo. These terms involve similar subject matter, (the inability to discharge cargo), although Clause 5(a) is more specific with respect to the present situation, (namely, it specifically refers to strikes). In light of these circumstances, the ejusdem generis rule provides that recovery cannot be allowed under the more general Clause, 4(b), since recovery was not permitted under the more specific Clause, 5(a). For this reason, relief cannot be granted to plaintiff under Clause 4(b).

■ Beyond this, Clause 4(b) does not by its express words grant Rainbow a right of recovery here. The Clause merely states that retention of the goods and extra time "shall be at the expense of the goods." The Clause does not state that Rainbow is entitled to additional compensation and/or compensation for all costs and expenses it may incur in retaining the goods on board. Rather, the Clause mere-

18. Of the same kind, class or nature.
"Is that when general words follow an enumeration of persons or things, by words of a particular or specific meaning, such general words are not to be construed in their wildest extent, but are to be held as applying only to persons or things in the same general kind or class as those

specifically mentioned. The rule, however, does not necessarily require that the general provision be limited in its scope to the identical things specifically named. Nor does it apply when the context manifests a contrary intention." Black's Law Dictionary, 464 (5th ed. 1979).

ly states that delay is "at the expense of the goods," and it is apparent that the Clause is designed merely to relieve the carrier from liability for damages and deterioration of the goods caused by an unanticipated delay. Accordingly, relief may not be had under Clause 4(b) of the Rainbow bill of lading.

## CONCLUSION

For the above reasons, I find that the plaintiff is not entitled to relief under the Rainbow bill of lading. The bill of lading does not afford relief in the situation at bar, and consequently, liability on the part of the government has not been established. Therefore, I need not address the issue of the measure of reasonable damages, and judgment is entered in favor of defendant.